Milo Burns, Respondent, *v.* Old Sterling Iron and Mining Company, Appellant.

1. Master and Servant — Safe Appliances — Negligence, An employee who is injured while riding in a "skip" or iron box used in hoisting ore out of a mine, and not intended for passengers, cannot recover damages where the master has provided a safe method of egress from the mine, unless he shows that he was directed to so ride by his superior, or that it had been the custom of the employees to thus use it to the knowledge of the master; nor can a recovery be had in any event in the absence of proof showing some defect either in the appliances or method of construction, and a master is not bound to anticipate that an employee riding in such a "skip" will permit any part of his person to extend beyond its sides.

2. Best Known Appliances. A master is not bound to use the best known appliances, but only such as are reasonably fit and proper.

*Burns* v. *Old Stirling I. & M. Co.*, 105 App. Div. 627, reversed.

(Argued March 15, 1907; decided April 2, 1907.)

Appeal from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered May 31, 1905, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Henry Purcell* and *John C. Trolan* for appellant. The defendant was not negligent. (*Morris* v. *Brown*, 111 N. Y. 318; *Sellick* v. *Langdon & Co.*, 55 Hun, 19; *Cleary* v. *Blake*, 14 App. Div. 602; *Del Sejnore* v. *Hallman*, 153 N. Y. 274; *Barrett* v. *L. O. B. Imp. Co.*, 68 App. Div. 602; *Quinn* v. *Baird*, 49 App. Div. 270; *Daley* v. *Brown*, 45 App. Div. 432; *Gorman* v. *White*, 19 App. Div. 324; *Hoehmann* v. *M. E. Co.*, 4 Misc. Rep. 160; *Dobbins* v. *Brown*, 119 N. Y. 188.) The measure of the defendant's duty was the exercise of a reasonable degree of care for the protection of its servant, the plaintiff, and if it adopted all the precautions

that a reasonably prudent man would have under the same circumstances it cannot be held liable. (*Dobbins* v. *Brown*, 119 N. Y. 188; *Pantzar* v. *T. F. I. & M. Co.*, 99 N. Y. 368; *Burke* v. *Witherbee*, 98 N. Y. 562; *Probst* v. *Delamater*, 100 N. Y. 266; *Hickey* v. *Taffe*, 105 N. Y. 26; *Sweeney* v. *Envelope Co.*, 101 N. Y. 250.) The plaintiff was guilty of negligence as matter of law. (*Williams* v. *D. R. Co.*, 116 N. Y. 628; *Wiwirowski* v. *L. S. R. R. Co.*, 124 N. Y. 420; *Swenson* v. *M. I. Co.*, 24 N. Y. S. R. 43; *O'Brien* v. *W. S. Co.*, 100 Mo. 182; *Hoehmann* v. *M. Eng. Co.*, 4 Misc. Rep. 160; *Morris* v. *Brown*, 111 N. Y. 318; *Dale* v. *D. R. Co.*, 73 N. Y. 468; *Hallahan* v. *N. Y. R. Co.*, 102 N. Y. 194; *Breen* v. *R. R. Co.*, 109 N. Y. 297; *Vrooman* v. *Rogers*, 132 N. Y. 167.)

*Arthur W. Orvis* for respondent. The defendant was negligent in maintaining this dangerous chute, allowing its employees to ride up and down in the skip and in not promulgating and enforcing adequate rules to prevent employees riding therein while the chute was in its position in the mine. (*Ford* v. *L. S. & M. S. R. R. Co.*, 124 N. Y. 493; *Doing* v. *O. & W. R. R. Co.*, 151 N. Y. 580; *Sheehan* v. *N. Y. C. & H. R. R. R. Co.*, 91 N. Y. 332; *Abel* v. *D. & H. C. Co.*, 128 N. Y. 662; *Eastwood* v. *R. M. Co.*, 86 Hun, 92; 152 N. Y. 651; *Pantzar* v. *T. F. M. Co.*, 99 N. Y. 368; *Whittaker* v. *D. & H. C. Co.*, 126 N. Y. 544; *Hunter* v. *O. & W. R. R. Co.*, 116 N. Y. 615; *Weber* v. *N. Y. C. & H. R. R. R. Co.*, 67 N. Y. 587.) It was not negligence on the part of plaintiff to ride in the skip, as the other employees were permitted to do. (*Stuber* v. *McEntee*, 142 N. Y. 200; *Johnson* v. *H. R. R. R. Co.*, 20 N. Y. 65; *Stackus* v. *N. Y. C. & H. R. R. R. Co.*, 79 N. Y. 464; *Kain* v. *Smith*, 89 N. Y. 375; *Hayes* v. *Bush*, 41 Hun, 407; *Corcoran* v. *Holbrook*, 59 N. Y. 517; *Harris* v. *Uebelhoer*, 75 N. Y. 169; *Sprong* v. *B. & A. R. R. Co.*, 58 N. Y. 56; *Stringham* v. *Stewart*, 100 N. Y. 516; *Francis* v. *N. Y. S. Co.*, 114 N. Y. 380; *Rosenberg* v. *Schooler*, 101 N. Y. Supp. 505; *Francis*

v. *N. Y. S. Co.*, 114 N. Y. 380 ; *Schineer* v. *Gas Light Co.*, 147 N. Y. 529.)

Werner, J.   The defendant is a domestic corporation engaged in mining iron ore in two mines known as the " Old Sterling " and the " Dickson," both of which are located on the R., W. & O. branch of the New York Central railroad, about two miles from the village of Antwerp in the county of Jefferson.   The plaintiff commenced work for the defendant at the Dickson mine in December, 1901, and continued until the time of the accident, which occurred on the 9th day of April, 1902.   The general charge of negligence against the defendant set forth in the complaint is, that the defendant failed in its duty to provide the plaintiff with a good, safe and secure place to work, and the specification in that behalf is, that the defendant negligently and carelessly constructed and suspended an ore chute in a shaft used as a passageway for a car called a " skip," by means of which ore was elevated from the mine to the surface of the earth, where it was sorted and loaded on railroad cars for shipment ; that the ore chute as thus constructed was dangerous to the life and limb of persons riding in the skip ; and that the plaintiff, while riding in this skip at the direction of the defendant and in the performance of duties which were a part of his work, caught his hand between the edge of the skip and the platform of the chute referred to, in such a manner that his hand and arm were crushed and permanently crippled.

The record discloses that the plaintiff's work consisted in sorting the ore after it had been elevated from the mine and dumped in the car.   This duty was performed in a building called the " top-house," which had been erected over a branch railroad track extending into the defendant's premises.   Close to the " top-house," and practically at right angles with the railroad siding, was the main shaft of the mine, extending into the earth at an angle of about fifty-seven degrees, to a depth of about one hundred and eighty feet.   This shaft was from six to eight feet in diameter and was equipped with a

12

track upon which the car or skip was drawn back and forth by means of a cable, which was operated by an engineer in a power house so placed that the engineer could see when the skip reached the "top-house." The power house was connected with the two levels or floors of the mine by wires and bells, by means of which signals were transmitted to regulate the operation of the skip. The skip, which was described as being like an oblong box with the top off, was constructed of boiler iron, and its dimensions as it rested upon the track were about three feet in width, about three and one-half feet in height, and from four to five feet in length. In its operation through the shaft it had an unobstructed passage with ample room on all sides of it, except at a point about seventy-five feet below the surface of the earth, where the mine had formerly been worked upon what is known as the "upper level." At this point a platform had been constructed across the shaft with an opening in it just large enough to permit of the passage of the skip. This platform was designed to be used as a chute by means of which the ore mined on the "upper level" could be loaded into the skip, and the reason for making the opening in the chute just large enough for the passage of the skip, was to prevent pieces of ore from falling down into the shaft to the danger of the workmen employed in the lower level. The upper level, which had been worked for many years, was not in use at the time of the accident and had not been used for several months prior thereto, except for the purpose of removing some odds and ends of ore that had previously been mined. During the time when this upper level had been in active use the shaft, at the place where it was intersected by the chute had been lighted by electricity, but was not lighted at the time of the accident, and that particular place in the shaft was described by one of the witnesses as being "somewhat dark ; about like dusk."

The record further discloses that the "top-house" in which the ore was sorted was open at both ends, so that the men engaged in sorting ore were exposed to the inclemencies of the weather. For the purpose of avoiding this, if possible,

the defendant's superintendent had instructed the plaintiff to go down into the mine at his convenience to ascertain if it would be practicable to sort the ore in the mine with the aid of electric light.  On the day of the accident the plaintiff, being temporarily disengaged, went down in the skip with one Watson, the defendant's master mechanic, and after remaining in the mine about fifteen minutes the plaintiff and Watson and one Phillips entered the skip, the signal was given, and the skip was started on its upward journey.  The plaintiff instead of keeping his whole body within the skip, rested his hand or arm upon the top so that it projected over the side and when the skip reached the upper level the plaintiff's arm was caught between the skip and the chute and crushed as above stated.  The plaintiff testified that he had never been down the shaft before; that he did not know of the existence of the chute; that the shaft was so dark that he could not see; and that he had not been warned either by Watson or any one else that it was dangerous to permit any portion of his body to extend beyond the sides of the skip.  He admitted that he had not been directed to use the skip in going into the mine; that he had entered it at the request of a fellow-servant; and that the defendant had provided a system of ladders which were well lighted, in good repair and commonly used by the workmen in going and coming from the mine.  There was evidence tending to show that the skip had been used at various times by at least five of the defendant's employees, but it did not appear that this was known to the defendant's superintendent.  The skip and chute in question had been in use during a period of about eighteen years without accident until the plaintiff was injured.  At the Trial Term the plaintiff recovered a verdict and the judgment entered upon it was affirmed at the Appellate Division.

In submitting this case to the jury the learned trial judge charged that there were two preliminary questions to be considered, upon both of which there must be an affirmative finding in favor of the plaintiff before the general questions of the defendant's negligence and plaintiff's freedom from con-

tributory negligence could properly be determined.    The first of these preliminary questions was whether the skip in which the plaintiff was injured was "an appliance furnished by the master for the use of its servants in the way that it was used on this occasion;" and the other was "whether the plaintiff was at the time of the accident rightfully in this mine at all." In respect of this latter question the jury was properly charged that if the plaintiff "had no business there, if he was simply there for his own amusement, there can be no recovery in this case.    In that event he was, if not a trespasser, yet not in the service at that moment of the defendant, and the defendant owed no duty to him with regard to this skip which the evidence shows it did not perform."    As there was some evidence to support the plaintiff's contention that on the occasion of the accident he went into the mine in obedience to directions given him by Jameson, the defendant's superintendent, there was as to this branch of the case a question of fact for the jury.    We think, however, that no issue was presented upon the other question whether the skip "was an appliance furnished by the master for the use of its servants in the way that it was used on this occasion," and that upon this feature of the case the trial court should have decided against the plaintiff as matter of law.    It is conceded that the skip was not a passenger elevator, but was simply an iron receptacle in the form of a box to be used in hoisting ore from the mine to the "top-house."    The mine, as we have seen, was equipped with a system of ladders which were well lighted, kept in good order, and commonly used by the defendant's employees in going to and coming from the mine.    The plaintiff had never ridden in the skip before the occasion when he was injured, and he entered it then, not by direction of the defendant's superintendent, but upon the invitation of a fellow-servant.    As there was no direct evidence tending to show that the skip, which was obviously unsuitable for safe and comfortable passenger service, was used by the workmen employed in the mine at the express command or with the affirmative assent or knowledge of the

defendant, the plaintiff attempted to show such a general use of the skip for that purpose as to charge the defendant with constructive notice of the fact. In this we think the plaintiff failed. There is no evidence that any of the ordinary employees of the defendant ever rode up and down in the skip in the presence of Jameson, the superintendent, or that any such use of it was ever brought to his attention. It is true that the defendant and several of the witnesses testified to the use of the skip by several of the employees, but when this evidence is carefully analyzed it falls far short of establishing such a general custom as to charge the defendant with notice or knowledge from which consent may be implied. At the time of the accident there were from twenty-five to thirty men employed in the mine, and there were periods when there were many more. There were only five employees who, according to the evidence adduced in behalf of the plaintiff, had used the skip in going to and coming from the mine. These were Watson, the master mechanic; McCormick, the mine boss; Phillips, the blacksmith; Whitford and Connolly, miners. It is quite apparent that the duties of the first three of these employees were of such a special nature as to necessitate frequent trips to and from the mine during working hours, and for aught that appears they may have used the skip with the express consent or at the direction of the defendant's superintendent. The evidence upon this subject almost raises the presumption that these three were not in the category of ordinary employees, for Phillips, the blacksmith, testified: " When I say that I used to take the time of the men as they went down in the shaft, I mean the ladder shaft. I never saw any men going down the skip shaft at any time when they went down to their work." It will thus be seen that after eliminating Watson, McCormick and Phillips, whose special duties placed them in a class by themselves, Whitford and Connolly are the only employees who are shown to have used the skip in riding to and from the mine. In that connection Whitford made an extremely significant admission when he said: " I do remember one occasion when I was

going down into the Dickson mine in the skip. I saw Mr. McCormick and he told me I must not go down there. He told me it was against the rule to go down in the skip."

In the consideration of the question now under discussion we have not adverted to the evidence tending to show that the defendant had posted notices warning its employees against the use of the skip, for as to that there was room for conflicting inferences from which a jury might have concluded either that the notices were not as explicit as they should have been, or were not so placed upon the premises as to clearly indicate the skip as one of the appliances with reference to which warning was intended to be given. After eliminating all evidence of that character, and taking the plaintiff's case in its strongest possible aspect, we think it would be going too far to hold that there was evidence upon which a jury should have been permitted to find that there had been such a general use of the skip by the defendant's employees for the purpose of riding to and from the mine as to charge the defendant with notice, and thus fasten upon it a legal liability for a failure to provide such safeguards as might have been deemed necessary, if the skip had been generally used for passenger service with the defendant's knowledge or consent. We, therefore, think it was error to send the case to the jury, and that the plaintiff should have been nonsuited.

There is, however, another angle from which this case may be looked at, but the result is equally fatal to the plaintiff. If we assume for the purposes of this discussion that the plaintiff was rightfully in the mine in the performance of some duty delegated to him by the master, and that the skip was an appliance which was generally used by the workmen in going to and returning from the bottom of the shaft, so that the plaintiff might properly have concluded that he was also entitled to use it for the same purpose, the question which first presents itself is whether the defendant was guilty of negligence; in other words, whether it omitted to perform any duty in this behalf imposed upon it by law. The only negligence attributed to the defendant by the complaint is, that it

negligently and carelessly allowed the ore chute in question to be improperly, negligently and dangerously suspended in such a manner above the track over which said skip passed as to be dangerous to the life and limb of persons traversing through said shaft in said skip.   According to the evidence the skip and chute had both been used for eighteen years without accident until the plaintiff was injured.   There is not a word of testimony in the record which tends to show that the chute as•constructed was an improper or unsafe appliance. On the contrary, it appears that it would not have answered the purpose for which it was designed if the opening therein for the passage of the skip had been larger than it actually was.   It was intended to fit so closely that when the skip was being loaded at the chute there could be no danger of dropping ore into the mine below.   The plaintiff's proof, therefore, does not support the allegation of his complaint, and the record seems to indicate that the jury found the defendant guilty of negligence because it failed to warn the plaintiff of the danger in the use of the skip.   Thus it appears that the cause of action alleged was not proved, and that which was proved was not alleged.   In this respect the case at bar resembles the case of *Dobbins* v. *Brown* (119 N. Y. 189), where it was held that the mere breaking of an appliance which was not proven to be defective in plan or structure did not justify an inference of negligence where the only charge in the complaint was that the machinery, appliances and apparatus used by the defendants in their work for communication between the surface of the earth and the bottom of the shaft were unsafe, defective and insecure.

But, aside from all this, the evidence tended to show that both the skip and the chute were well adapted to the purposes for which they were primarily intended to be used. There was nothing inherently dangerous in the plan or method of their construction.   Neither of them were shown to have been out of repair.   It may well be that both might have been improved upon, but this is not the test of the defendant's duty or liability.   A master is not bound to furnish the

best known appliances for the work in which his servant is employed, but only such as are reasonably fit and safe. He satisfies the requirements of the law if in the selection of machinery and appliances he uses that degree of care which a man of ordinary prudence would employ, having regard to his own safety if selecting them for his individual use. (*Hickey* v. *Taaffe,* 105 N. Y. 26 ; *Stringham* v. *Hilton,* 111 id. 188 ; *Harley* v. *Buffalo C. M. Co.,* 142 id. 31.) The application of this general rule to the case at bar is most obvious. Even if the evidence could be regarded as sufficient to charge the defendant with knowledge that the skip was generally used by its employees for the purpose of riding to and from the bottom of the shaft, it cannot be said that the defendant, in the exercise of reasonable care and prudence, was bound to anticipate that an employee using it for that purpose would permit any part of his person to project beyond the sides of the skip. On the contrary, the size and structure of the skip, the primary purpose for which it was used, and the general character of the shaft in which it was operated, may well have led the defendant to assume that any employee who should venture to ride in it would realize that he could only be safe by keeping his whole person within it. This appeals to us as the reasonable and rational view of the case, and to overcome it we must have something more than mere surmise or speculation.

We think the judgment should be reversed and a new trial granted, with costs to abide the event.

CULLEN, Ch. J., GRAY, VANN, WILLARD BARTLETT and CHASE, JJ., concur ; HISCOCK, J., not sitting.

Judgment reversed, etc.