WYMAN v. LEHIGH VALLEY R. CO.

(Circuit Court of Appeals, Second Circuit. January 14, 1908.)

No. 96.

1. MASTER AND SERVANT—INJURIES TO SERVANT—RAILROAD EMPLOYÉS—EM-PLOYERS' LIABILITY ACT.

Where a complaint for injuries to a railroad employé was expressly drawn under the New York employers' liability act, and the answer admitted that the notice required by the provisions thereof had been received by defendant, a ruling that such act had no application to the case was erroneous.

2. WRIT OF ERROR—REVIEW—HARMLESS ERROR.

Where, in an action for injuries to a railroad employé by the alleged negligence of the wrecking master of the road, the court charged that such master was the representative of the road and was liable for his negligence, such instruction was even more favorable to plaintiff than the full

recognition of the New York employers' liability act under which the action was brought would have justified, so that plaintiff was not prejudiced by an erroneous ruling that such act had no application to the case.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 4052–4062.]

3. MASTER AND SERVANT—INJURY TO SERVANT—DUTY OF MASTER.

It is a master's duty to furnish his servant suitable, safe, and sufficient machinery, means, and appliances, and sufficient and competent helpmates, the master being liable for an injury occurring by reason of a defect in machinery, ways, or works, or by reason of the incompetency of a fellow servant of which he knew or by the exercise of reasonable diligence should have known; but having complied with the law in this respect, neither he nor the person delegated as his representative being guilty of a negligent act, his duty to the servant is performed.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 171–174, 330–336.]

4. SAME—PROXIMATE CAUSE.

A car having been derailed, defendant's wrecking master, a man of unusual experience and more than ordinary intelligence, was sent for and superintended the rerailing thereof, in the course of which the car was pulled by a cable attached to an engine by a coupling link. After the third pull the link parted, and in some manner flew back 60 feet over the top of the car and struck plaintiff's intestate, who was sitting near the end of the car. *Held*, that the breaking of the link was the proximate cause of decedent's injury.

5. SAME—NEGLIGENCE—METHOD OF WORK.

A railroad wrecking master of large experience used blocks with which to rerail a derailed car, instead of replacers. Decedent was injured by being struck by a link attached to a cable used to pull the car onto the tracks. The car was actually rerailed on the third pull, notwithstanding the breaking of the link, and there was evidence that, by reason of the position of the trucks with reference to "toggle straps," replacers could not be used. *Held*, that the wrecking master, not being required at his peril to select the best method of rerailing the car, but being required only to use his best judgment, was not negligent in using blocks instead of replacers.

6. SAME—EVIDENCE—APPLIANCES USED BY OTHERS.

In an action for death of plaintiff's intestate while assisting in rerailing a railroad car by the breaking of a coupling link, a question asking whether there were other sizes of links used on railroads at the time of the accident was properly disallowed for failure to assume that the conditions were substantially similar.

7. EVIDENCE—MATERIALITY.

Where a coupling link by which intestate was injured during the rerailing of a car was shown to have parted on the third pull, evidence as to whether it appeared from the fractured parts that it was broken suddenly or by a long strain was immaterial.

8. WITNESSES—CROSS-EXAMINATION—LIMITATION.

Where a witness who had testified before the coroner on having his testimony read stated that he had so testified, the court did not err in halting the cross-examination when it went to the extent of implying that the witness' statements at the trial were unreliable because he had stated facts which he had not mentioned before the coroner for the reason that he had not been asked to do so.

In Error to the Circuit Court of the United States for the Southern District of New York.

Writ of error to review a judgment entered upon the verdict of a jury in favor of the defendant, in an action brought by plaintiff to

recover damages resulting from the death of her husband, Frank W. Wyman, while in the defendant's employ as a brakeman.

Jacob Newman (H. L. Schuerman, of counsel), for plaintiff in error.
Alexander & Green (Allan McCulloh, of counsel), for defendant in error.

Before LACOMBE, COXE, and WARD, Circuit Judges.

COXE, Circuit Judge. The accident occurred July 7, 1904, on defendant's premises at Pier 56 North River, New York. A car float had come to the dock and the movable part known as the "bridge" would not sink low enough, with the weight of the engine alone, to meet the float. Accordingly the defendant's employés took a car known as a gondola, loaded with structural iron from the yard and ran it down to depress the bridge. It was a wooden car about 34 feet long with two trucks, each truck having two pair of wheels. The weight of the car was about 80,000 pounds. In running the car down, the rear truck went off the rails on the bridge and onto the float. The four wheels of the truck had gone off the rails and were resting on wood on the deck of the car float. The wheel that was farthest out of alignment was about six or eight inches from the rail to which it belonged. The rear wheel had gone through the float, had sunk through the wood. The forward truck was on the rails on the bridge. After the engineer of the switching engine had made several abortive attempts to pull the gondola back on the track, the wrecking master Sims was sent for. He arrived shortly thereafter on a tug with appliances, and his crew of five men and assumed control of the work of rerailing the car. He had been in the employ of the defendant since 1866 and had 32 years' experience in wrecking. No question is raised as to his competency. When he arrived he found that the two hind wheels of the derailed truck were between the float and the bridge, the fore wheels being in the toggles.

The first step taken was to chain the truck to the body bolster so that when the body of the car was raised it would raise the truck at the same time, so that the oil box would clear the toggle straps. Having jacked up the car and placed oak blocks under the wheels, Sims and his men lowered the car until the wheels rested on the blocking, when the jacks were removed. A new steel cable was furnished by the agent on the pier, it was 35 feet long with a hook in an eyelet at one end and a link in an eyelet at the other end. An additional link was needed to attach the cable to the engine and Sims and Wyman, plaintiff's intestate, procured the link from a box on the bridge. After the connection was made Sims gave the signal, the engine started and pulled the car up the bridge about five feet. The car was again jacked up and blocking was laid on the lower side lengthwise and crosswise. The car was then lowered and the jacks removed. Sims examined the link, pin and cable and signaled for a second pull which was given, the car moving about 10 feet, bringing the front wheels of the rear truck about 3 inches from the rail. The hindmost wheel of the rear truck was just clear of the upper end of the toggle bar. They then got the car replacers, which were part of the ap-

pliances furnished by the defendant on the premises, adjusted the blocking in front of the wheels, greased the replacers and, after Sims had again examined the link and pin, he gave the third signal to proceed. The engine moved, the wheels dropped on the rails and immediately thereafter the link attached to the engine parted, and in some mysterious manner, flew back 60 feet over the top of the car and struck Wyman, who with Sims and Snyder, the pier agent, was sitting on a truss near the end of the car. Sims testified that he could not use the car replacers sooner than he did because he could not place them between the toggle strap and the string piece. He says, "I could not use the car replacer at any time before the hind wheels of the truck were free of the toggle bar because it would not allow the truck to curve." The link was the ordinary one used in coupling cars before automatic couplers were adopted.

The question submitted to the jury was whether the defendant was negligent in providing an improper link and in failing to inspect it properly prior to using it on this occasion. The jury found for the defendant.

Error is assigned because of the ruling of the trial judge that the New York employers' liability act "has no application to the case." We are at a loss to understand what considerations influenced the trial judge to make this ruling for the reason that the complainant was expressly drawn under the act and the answer admits that the notice required under the provisions thereof was received by the defendant. The ruling though technical error was not reversible error for the reason that the plaintiff was not prejudiced thereby.

In charging the jury that Sims was the representative of the Lehigh Valley Railroad Company and that the company was liable for his negligence, the court stated the rule even more favorably for the plaintiff than if he had given full recognition to the liability act.

The principal question debated is whether the court erred in refusing to submit to the jury the question whether the general method pursued by Sims in rerailing the car was a proper one. The plaintiff insists that it was not for the reason, first, that Sims should not have used blocks, but should have used replacers for getting the car back on the rails. Second, he should have unloaded the structural iron from the car to lighten the load and diminish the friction. Before considering this question it is well to understand what obligation rested upon the master under the conditions presented by this evidence. It is the duty of the master to furnish for the use of his servant, suitable, safe, and sufficient machinery, means and appliances and for his helpmates, competent men and a sufficient number of them to do the work required. He is liable if an injury occurs by reason of a defect in machinery, ways or works or by reason of the incompetency of a fellow servant, of which he knew or of which, by the exercise of reasonable care and diligence, he should have known. When he has complied with the law in this respect and neither he, nor the person delegated as his representative, is guilty of a negligent act, his duty to the servant is discharged.

In Looney v. Metropolitan R., 200 U. S. 480, 486, 26 Sup. Ct. 303, 305, 50 L. Ed. 546, the court says:

"To hold a master responsible, a servant must show that the appliances and instrumentalities furnished were defective. A defect cannot be inferred from the mere fact of an injury. There must be some substantive proof of negligence."

Dobbins v. Brown, 119 N. Y. 189, 23 N. E. 537.

In De Graff v. N. Y. C. Co., 76 N. Y. 125, the court says:

"Railroad corporations should be held to a high degree of care and responsibility; but there is a point beyond which the requirements would be regarded as unreasonable and oppressive, and would in effect make them insurers against all accidents or injuries arising therefrom. As a general rule the degree of vigilance required is measured by the dangers to be apprehended or avoided. It does not appear to be necessary that the full strength of these chains should be kept up. That would involve a test on every trip. * * * And again it does not appear that the breaking of a chain would ordinarily result in such an accident."

Bearing in mind that the question of the sufficiency and inspection of the link was submitted to the jury and answered by them in favor of the defendant, we have a case where all the above conditions which the law imposes on the master were complied with. There was at the pier for the use of its servants suitable and sufficient cables, links, pins, blocks, replacers, chains, jacks, and motive power necessary to rerail the car. There was a wrecking master of unusual experience and, judging from his printed testimony, of more than ordinary intelligence. There were 10 men on the pier ready to assist and, at times, assisting in the work. It would seem that nothing more was required of the master. All must agree that the proximate cause of the accident was the breaking of the link, if that had held there would have been no accident.

The plaintiff seeks to import into the law a new ground of liability which if adopted will practically make the master an insurer of the lives of his servants. Not only must he provide the best and latest machinery and appliances, but he must use such appliances on all occasions. Not only must he do what practical common sense dictates in adopting methods of work, but he must guard against every accident, no matter how extraordinary, which may happen in case some part of his tackle breaks. In short his conduct must be judged not by the conditions surrounding him at the time, but in the light of the opinions of experts who, after the accident, advance plausible theories as to what might have been done to prevent it. We think this is not the law.

In Washington & G. R. v. McDade, 135 U. S. 554, 10 Sup. Ct. 1044, 34 L. Ed. 235, the Supreme Court says:

"Neither individuals nor corporations are bound, as employers, to insure the absolute safety of machinery or mechanical appliances which they provide for the use of their employés. Nor are they bound to supply the best and safest or newest of these appliances for the purpose of securing the safety of those who are thus employed. They are, however bound to use all reasonable care and prudence for the safety of those in their service, by providing them with machinery reasonably safe and suitable for the use of the latter."

In Burns v. Old Sterling Co., 188 N. Y. 175, 183, 80 N. E. 927, 930, the court says:

"A master is not bound to furnish the best known appliances for the work in which his servant is employed, but only such as are reasonably fit and safe.

He satisfies the requirements of the law if in the selection of machinery and appliances he uses that degree of care which a man of ordinary prudence would employ, having regard to his own safety if selecting them for his individual use (Hickey v. Taaffe, 105 N. Y. 26, 12 N. E. 286; Stringham v. Hilton, 111 N. Y. 188, 18 N. E. 870, 1 L. R. A. 483; Harley v. Buffalo C. M. Co., 142 N. Y. 31, 36 N. E. 813)."

In McConnell v. Morse, etc., Co., 187 N. Y. 341, 80 N. E. 190, 10 L. R. A. (N. S.) 419, the court says:

"The case, therefore, is brought within the rule so often recognized and applied in this court, to the effect that where the master has upon hand at the place where the work is performed sufficient suitable material or appliances for the doing of the work, he is not liable for injuries resulting to a workman by reason of an error in judgment of the foreman or of a co-employé in selecting defective material or appliance (Vogel v. Am. Bridge Co., 180 N. Y. 373, 73 N. E. 1, 70 L. R. A. 725; Kimmer v. Weber, 151 N. Y. 417, 45 N. E. 860, 56 Am. St. Rep. 630, and cases cited)."

As to the method employed by Sims it will be seen that practically the sole accusation against him is that he did not use the car replacers. Sims testifies that he did use them as soon as they could be successfully employed and he is corroborated by two other witnesses and no one swore that they were not used. It is difficult to comprehend upon what theory this testimony can be ignored. The engineer who was on his engine, with the car between him and the rear trucks, did not mention the use of the replacers and another witness did not remember seeing replacers used. Because of this negative testimony it is argued that there was sufficient doubt on the question to warrant its submission to the jury. Assume this to be so, or let us go a step farther and assume that the testimony shows affirmatively that replacers were not used at any time. How then stands the question? Sims, after an inspection of the situation concluded to jack up the truck and use blocks. He gives reasons why replacers could not have been used at the outset owing to the position of the truck with reference to the rails and toggles. The plaintiff's expert testified that the use of blocks was a well-known and alternative method. He says:

"The usual method is to jack the car up when the wheels are off the track and before jacking them they put chains under the truck to hold it in position and keep it from dropping. They jack it up and use either blocks or car replacers. They can use either one or the other. After they put the block under and after they have jacked the cars and done the other things, they then pull the car by engine power with the cable. In order to use a car replacer you must have a surface so that you can place the car up to the car replacer on. I know what a toggle is. You could not put a car replacer on top of a toggle. If a toggle is close to the rail and the wheel is jammed down on the toggle you cannot put a car replacer in."

That Sims chose a perfectly practical method is demonstrated by the fact that, notwithstanding the breaking of the link, the car was actually rerailed on the third pull. That he did not expect such an accident as happened is demonstrated by the fact that he and the pier agent were sitting by Wyman's side when he was struck. Even on the doubtful assumption that he might have chosen a better method, the defendant is not liable for it was merely an error in judgment, and a master is only required to possess the faculties which belong to finite beings. In short, Sims was not required to take extraordinary

measures to guard against an accident which he had not the slightest reason to suspect and which was beyond the ken of human foresight. Whether the use of the replacers—assuming their use possible—would have prevented the accident is pure conjecture. Sims was not called upon to speculate, it is enough that he used his best judgment.

The expert called by the plaintiff was asked the following question: "Were there other sizes of links used upon railroads in 1904 and in July?" This question was objected to as incompetent, irrelevant, and immaterial and the objection was sustained. We think it was rightly sustained. Assuming that the answer would have been "yes" we fail to see how the information would have been of the slightest assistance to the jury. Even supposing that the answer might have been "yes, larger links," the same observation would apply unless it were shown that the conditions were substantially similar. For instance, the Pennsylvania Railroad might have used in 1904 very much larger links in hauling its heavy freight trains up the sharp grades of the Alleghanies and yet the fact would not have the remotest bearing upon the question as to what sized links should be employed by a pony switching engine engaged in the work of transferring single cars and small trains from car floats to the regular tracks of the railroad. If the question had been, "Were other sizes of links used by railroads in 1904 in hauling cars from car floats?" a different situation would be presented, although we do not intend to intimate that such a question would have been competent.

The same witness was asked, "Can you tell, looking at the fractured parts, whether or not it (the link) was broken suddenly or by a long strain?" In view of the undisputed testimony that the link parted on the third pull, we think the testimony called for by this testimony was immaterial. As the jury had the fact they did not need theories. The alleged errors in not permitting the plaintiff's counsel to cross-examine at length a witness called by the defendant, as to what he said when testifying at the coroner's inquest, were negligible. The testimony of the witness given before the coroner was read to him and he stated that he had so testified. It was only when the cross-examination went to the extent of implying that the statements of the witness at the trial were unreliable because he had stated facts which he had not mentioned before the coroner, that it was halted by the court upon the ground that the witness had not mentioned the facts before the coroner for the reason that he had not been asked to do so.

Other exceptions were taken and error assigned regarding them but we think they are disposed of by what has been already said.

The judgment is affirmed.