GEORGE MAUE, Respondent, v. THE ERIE RAILROAD COMPANY, Appellant.

Master and servant — railroads — when railroad company is not liable for injuries to employee who fell through uncovered farm crossing.

A master does not guarantee the safety of his servants. He is not required to furnish them an absolutely safe place in which to work, but is simply bound to exercise reasonable care and prudence in providing such a place. He is not liable for mere error of judgment, but only for culpable negligence.

In cases of injury to employees from accidents, the question of liability depends not upon what can be seen by everybody after the happening of the accident, but by what the party sought to be held responsible should have known or anticipated. So long as an employer is not an insurer, his liability must depend upon his exercise of that degree of care which would suggest itself to the mind of the ordinary man of average caution and prudence, under conditions which prevail before any accident has happened.

It is not negligence *per se* for a railroad corporation to maintain an uncovered underground farm crossing, and where it had maintained for twenty-eight years without accident such a crossing at a point where the brakemen of its freight trains were not required by the general rules of the company or by their usual duties to inspect their trains, the company is not liable to a brakeman who, upon a dark night, having knowledge of the crossing and its surroundings and acting without specific orders, walked between the tracks for the purpose of inspecting his train, and while so engaged fell through the uncovered crossing, there being no evidence that the company was chargeable with any knowledge that the uncovered opening might prove to be a menace to the safety of its employees.

*Maue* v. *Erie R. R. Co.*, 129 App. Div. 935, reversed.

(Argued March 16, 1910; decided April 5, 1910.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the fourth judicial department, entered January 23, 1909, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*William L. Marcy* and *Helen Z. M. Rodgers* for appellant. Defendant was not negligent in maintaining an uncovered crossing at the locality in question. (*Lafflin* v. *V. & S. R. R. Co.*, 106 N. Y. 136; *Harley* v. *B. C. Mfg. Co.*, 142 N. Y. 31; *Healy* v. *B., R. & P. Ry. Co.*, 111 App. Div. 618; *McKenna* v. *G. W. C. Co.*, 83 N. E. Rep. 113; *Burns* v. *O. S. I. & M. Co.*, 188 N. Y. 175; *Quigley* v. *Levering*, 167 N. Y. 58; *Hart* v. *Village of Clinton*, 115 App. Div. 761; *Marsh* v. *Chickering*, 101 N. Y. 396; *Pearsall* v. *N. Y. C. & H. R. R. R. Co.*, 189 N. Y. 474; *B., etc., Ry. Co.* v. *McOsker*, 88 N. E. Rep. 950.)

*Ford White* for respondent. It was negligence for the defendant to suffer this condition to remain in the pathway in which it expected and required its brakemen to walk when in the discharge of their duties. (*Fredenberg* v. *N. Y. C. & H. R. R. R. Co.*, 114 N. Y. 583; *Miller* v. *N. Y. C. & H. R. R. R. Co.*, 20 App. Div. 92; *Wallace* v. *C. V. R. R. Co.*, 138 N. Y. 302; *Plank* v. *N. Y. C. R. R. Co.*, 60 N. Y. 607.)

Werner, J. The judgment recovered by the plaintiff cannot be sustained upon the record before us, unless we are prepared to hold that it is negligence *per se* for a railroad corporation to maintain an uncovered underground. farm crossing, regardless of its location and without reference to the manner in which the tracks are used in the particular vicinity. The plaintiff, a former employee of the defendant, brought this action, under the Employers' Liability Act, to recover damages for injuries sustained by him at a place on the defendant's railroad known as "Letchworth's Crossing." The specific charge of negligence is that the defendant there maintained a dangerous opening or hole in its tracks, into which the plaintiff fell while in the proper discharge of his duty as brakeman in inspecting a train. The case is singular in that the facts bearing upon the defendant's alleged negligence are practically undisputed. A short recital of these facts will reveal the precise point at which we think the plaintiff's evidence fails to sustain his complaint.

The defendant's railroad crosses the Genesee river upon a single track structure known as Portage bridge. To the west of the bridge are double tracks, and also a siding which begins at a point 550 feet west of the bridge and continues westerly for a distance of about 3,250 feet to what is known as the Letchworth crossing. This crossing consists of an underground passageway which connects the two parts of the Letchworth estate, and its construction is of the kind known and proven to be in general use. The two sides of the passageway are flanked by walls of masonry which support stringers, upon which are superimposed the cross ties and rails. There is no other covering over this crossing than that which is furnished by the stringers, ties and rails where the tracks cross the underground passage. As will be seen from this description, the space between the two tracks over the underground passageway is not covered by anything. The opening is about three feet wide between the inside ends of the ties, and from twelve to fifteen feet long between the supporting walls. At the time of the accident to the plaintiff this farm crossing had been thus maintained for a period of twenty-eight years without mishap or casualty. At a point about 1,000 feet westerly from the farm crossing there is a yard limit signal which indicates, as agreed by all the witnesses, that engineers are to have their trains under control upon the assumption that other trains may be within the yard limits. This yard is a regular stopping place, because the double tracks on both sides of the river converge to the single tracks across the bridge, and also because it is equipped with cranes or tanks for supplying engines with water. It is not a switching place, nor a point designated for the regular inspection of trains. The plaintiff had been employed by the defendant for a period of three years preceding the accident. He had been a brakeman upon freight trains traversing this particular part of the defendant's railroad for at least four months, had passed over this farm crossing many times, both by day and night, and was familiar with the surroundings as well as with the custom in the stoppage of trains. Having

thus briefly described the *locus in quo* and its usage, we now turn to a *résumé* of the plaintiff's story of the accident.

At six o'clock in the afternoon of April 25th, 1906, the plaintiff left Buffalo as one of the brakemen in charge of a train of eighty freight cars drawn by two engines. The train arrived at Castile at about half-past one o'clock on the next morning. There the train stopped. One of the engines was disconnected, switched to a turntable and turned for use in pushing the train on to Portage and across the bridge. While another brakeman assisted in the turning of this engine, the plaintiff began an inspection of the south side of the train. Equipped with lantern, oil can, hook and waste he worked from the caboose forward to the engine. In the course of his progress he discovered signs of a heated journal on the north side of the train, but before he had time to go to that side, the train started. He stepped upon the engine and rode to the yard limits at Portage bridge, where the train stopped. Without directions from any one he alighted and proceeded westerly toward the caboose for the purpose of inspecting the northerly side of the train. This necessitated walking between the two tracks. After he had gone westward about thirty-five car lengths he came upon a heated journal which he began to pack and oil. While thus engaged the train started. He continued his work on the heated journal, walking along five or six steps with the slowly moving train. Meanwhile his lantern, which he had set on the ground, went out and he moved back to get it. He re-lighted the lantern and walked westward toward the rear of the train, intending to take note of the journals as they passed him. After he had taken four or five steps toward the west, he fell into the opening over the farm crossing above described, and sustained the injuries set forth in the complaint. The case, as now presented, turns wholly upon the question whether the defendant was negligent in maintaining this farm crossing without a deck or cover, and it is, therefore, unnecessary to discuss either of the other questions presented by counsel.

The undisputed evidence is that the structure known as

" Letchworth Crossing " is a typical underground farm passageway, in general use upon the railroads of the country, and this evidence is in accord with common knowledge of the subject. Wherever farm lands have been bisected by railroad embankments, such crossings are familiar objects. It goes without saying that many such crossings are so situated that no one would think it essential to cover them for the protection of railroad employees. Railroad bridges with two or more tracks, are usually left with an open or unplanked space between the tracks, unless located in a place where switching, coupling, or other work about trains necessitates the frequent, safe, and convenient passage, to and fro, of employees. In view of these general considerations, it is obviously impossible to hold the defendant responsible upon the broad ground that the mere maintenance of such a structure is, of itself, evidence of negligence, for that would involve the radical conclusion that all such structures are to be condemned as improper without regard to their use or location. It must follow, therefore, that when the maintenance of such a structure is relied upon by a plaintiff to establish the charge of negligence against a defendant, there must be evidence of specific circumstances and conditions from which dereliction of duty may be inferred. In the application of that rule to the case at bar, the statement of a few additional facts will serve to show why the plaintiff has failed to make out his case.

It appears that Castile is a place where trains were regularly inspected. The crew in charge of this train numbered five men. The movements of none of these at Castile are accounted for except those of the plaintiff, who was engaged in his duty of inspecting the train, and of another brakeman who was busy in helping to turn the detached locomotive. The inference is permissible, if not necessary, that if this other brakeman had not been engaged with the locomotive he would have assisted in the work of inspection at Castile, and that he could have finished one side of the train while the plaintiff completed the other side. As it does not appear whether the other brakeman was acting under specific orders

or in the general line of his duty in helping to turn the engine, we cannot assume that the defendant was chargeable with knowledge that the train had not been fully inspected at Castile. That being the regular place of inspection, it was not to be anticipated that, in the ordinary course of events, it would be necessary to continue at Portage bridge, only two miles distant, an inspection begun but not finished. The natural inference would be that full inspection had been made at Castile, and that none would be necessary at Portage bridge, beyond the casual oversight which might be dictated by prudence at any stopping place. It is entirely clear from the record that the plaintiff, in finishing his inspection at Portage bridge, was not acting under specific orders, and the general rules defining his duties throw no light upon the question whether there was any such regular or habitual inspection of trains at that place as to charge the defendant with knowledge that Letchworth crossing was a menace to the safety of brakemen. The rule promulgated by the defendant imposing upon brakemen the duty of making couplings, attending to brakes, displaying signals, assisting in loading and unloading freight, inspecting cars, and doing all other things necessary for the prompt and safe movement of trains, is general in its application and has no particular significance as applied to the conditions which existed at Portage bridge. The plaintiff's testimony is not more definite. It tends to show that it is a brakeman's duty at all times to see that his train is in good condition, and that there are no defects in the brakes, running gear or other appliances. That is a fact as to which there is no disagreement in the testimony, but it is also a fact which must be considered in the light of practical conditions. It relates to the brakeman's general duty of watchfulness as well as to the regular inspection of trains. The one is constant and extends over every fraction of the journey, while the other is usually to be exercised only at designated stations. It would be as unjust to hold that railroad corporations should be required to anticipate every possible emergency that may arise in the progress of trains as to absolve

them from responsibility for the unnecessary maintenance of
dangerous conditions at particular places where brakemen, in
the regular inspection of trains, are subjected to perils which
can be obviated by the exercise of reasonable care and
prudence.

The principle by which this case is governed is so well set-
tled and so generally understood as to render the citation of
authorities almost superfluous. The master does not guaran-
tee the safety of his servants. He is not required to furnish
them an absolutely safe place in which to work, but is simply
bound to exercise reasonable care and prudence in providing
such a place. He is liable not for mere error of judgment,
but only for culpable negligence. The experience of this
unfortunate plaintiff has shown that under the peculiar cir-
cumstances of this case the uncovered opening was a place of
danger, and the evidence tends to show that the defect is one
which can be remedied. Over against these suggestions there
is the stubborn fact that this farm crossing is of the standard
construction in general use by the railroads of the country,
and that the defendant has maintained it for twenty-eight
years without accident or injury to any one. The defend-
ant's duty and liability are to be measured not in the light
of plaintiff's sad mishap, but by the conditions which ante-
dated it. If the defendant, in the exercise of reasonable
care and foresight, had been chargeable with knowledge that
this opening in its tracks might prove to be a menace to the
safety of its employees, the plaintiff could sustain the judg-
ment herein. But that is just where his evidence fails. In
that respect his case is like *Dongan* v. *Champlain Transpor-
tation Co.* (56 N. Y. 1), where a passenger slipped under the
gangway rail of a steamboat, fell overboard and was drowned.
There it appeared that all the boats plying upon the same lake
were constructed in the same way; that they had been thus
maintained for many years; that no similar accident had ever
happened before, and that the defect in the gangway rail was
one which could be cured by a different construction. Quite
similar is the case of *Loftus* v. *Union Ferry Co. of Brooklyn*

(84 N. Y. 455), where a child six years old while leaving one of defendant's boats fell through a guard rail and was drowned. In both of these cases the accidents proved the dangers, and the evidence tended to show that they might have been avoided. But this court held that liability was not predicable upon the accidents themselves and that the real question was whether the defendants ought to have foreseen the dangers. In discussing that point in the *Loftus* case Judge ANDREWS said : " But the facts rebut any inference of negligence on this ground. The company had the experience of years, certifying to the sufficiency of the guard. That it was possible for a child, or even a man to get through the opening was apparent enough. But that this was likely to occur was negatived by the fact that multitudes of persons had passed over the bridge without the occurrence of such a casualty." (p. 460.) *Lafflin* v. *Buffalo & South Western R. R. Co.* (106 N. Y. 136, 141) and *Burns* v. *Old Sterling I. and M. Co.* (188 N. Y. 175, 184) are familiar illustrations of the same rule. In all such cases the question of liability depends not upon what can be seen by everybody after the happening of an accident, but by what the party sought to be held responsible should have known or anticipated before the occurrence. So long as an employer is not an insurer, his liability must depend upon his exercise of that degree of care which would suggest itself to the mind of the ordinary man of average caution and prudence under conditions which prevail before any accident has happened. We think that the defendant, judged by that standard, has not been shown to be guilty of culpable negligence.

The judgment should be reversed and a new trial granted, with costs to abide the event.

CHASE, J. (dissenting). The plaintiff, while in the performance of his duty as a rear brakeman on a freight train of the defendant, fell to the roadway of an underground farm crossing through an opening between the east and west-bound tracks of the defendant's railroad and received serious injuries for which he seeks to recover in this action.

The general plan of the farm crossing was one common in railroad construction. A roadway twelve or fifteen feet wide was carried across and under the railroad tracks eighteen feet below their level. Stone abutments were erected on either side of such roadway, and on such abutments were placed stringers on which the ties and then the rails were laid. Such construction left an open space between the two sets of tracks, which was about three feet wide and extended over the crossing. The plaintiff at the time of the accident was employed on an east-bound train consisting of eighty loaded cars. The farm crossing in question is less than one-half mile westerly of Portage bridge over the Genesee river. Castile is a station about four miles westerly of Portage bridge. The train upon which the defendant was employed reached Castile about 1 : 30 o'clock in the morning. It there stopped and one of the two engines drawing the train was detached and turned upon a turntable preparatory to being used to assist in pushing the train to and over Portage bridge. The head brakeman assisted in the work with the engine, while the plaintiff, in accordance with his duty, took a lantern and certain appliances and proceeded to examine the running gear of the train. He commenced on the southerly side of the train and continued along that side thereof, swinging his lantern between the cars and examining the running gear and appliances, including the journals. He found that three of the journals on the southerly side of the train had become hot, and required that the packing should be readjusted, and he added oil from an oil can which he carried. When he had finished inspecting the southerly side of the train it was about to start, and he got upon the engine and rode thereon until the train reached the regular stopping place immediately west of Portage bridge. The bridge at that point has but one track, and there is a general rule of the defendant that all trains must stop before proceeding over the Portage bridge, and there is also a water spout near the bridge from which water is taken for the engine. When this train stopped at Portage bridge the plaintiff started on the northerly side thereof, walking as he was

required to do between the two tracks inspecting the cars from the northerly side as he had done at Castile on the southerly side. Before he left Castile he knew from a peculiar odor that there was a heated journal or journals on the northerly side of the train. In proceeding westerly with his inspection of the northerly side of the train he found a journal about thirty-five cars from the engine that was heated, and with a peculiar hook he made what he called a pocket about the journal and filled it with oil. As he was doing so the train started and proceeded easterly. He had placed his lantern upon the ground while he was repacking the journal. It had fallen on its side and the light had gone out. He walked with the train four or five steps to complete the work that he was doing. He then turned and picked up his lantern and lighted it — put it on his arm and picked up his other appliances and turned westerly, intending to get upon the train and proceed with it, as he knew that the next stopping place was about fifteen miles easterly, and as he took a few steps to the westerly, watching the journals of the cars by the light of his lantern as they passed, he fell into the open space between the tracks, as stated.

The rules of law applicable to this case are simple and well known. It is not necessary to state them. The plan or construction of the farm crossing is not in controversy. The question to be determined is whether the defendant under the circumstances disclosed in this case was negligent in leaving said space open and uncovered. It was entirely practical to cover it by the use of timbers and planking. It appears that it is the usual custom to cover similar openings when they are within yard limits where switching of cars and the making up of trains is a common occurrence, and it also appears that it is not the custom of railroads generally to cover similar openings along the line of their roads where the trainmen are not required to walk between the tracks for the inspection of their trains or for any purpose except in cases where the train is there stopped and held for some unforeseen and unusual reason. One of the witnesses called by the

defendant as an expert, referring to the space between the tracks, testified : " When it is necessary for trainmen to pass back and forward daily and several times a day I regard it as necessary to cover them." I think that the evidence discloses a situation at the farm crossing mentioned which made the question of the defendant's negligence in failing to cover the opening for the protection of its employees a question of fact. It appears as I have stated that every train was required to stop before crossing the bridge and that the defendant had there provided a water spout from which water could be taken for the use of the engine and that it required ten minutes or more to take such water. It also appears that the farm crossing was within the space covered by an ordinary freight train while standing west of the bridge in obedience to the orders of the company and for the purpose of taking water. It further appears that there was a yard limit sign some distance west of the farm crossing. It may be helpful in considering the question as to the negligence of the defendant to refer more specifically to the significance of the defendant's yard limits at that point.

Within the yard limits of a yard where switching of cars is done and trains are made up there are special rules to govern the different employees therein. The yard limits at Portage bridge are very significant, but switching was not ordinarily done within such yard limits and trains were not made up there except that there was one switch therein upon which crippled or disabled cars could be placed if found in the train when it was standing there prior to crossing the bridge and while taking water. The yard limits were there established because every train was compelled to stop before crossing the bridge, and also because they might stand there for ten or fifteen minutes for the purpose of taking water. The yard limits there meant to every trainman upon trains approaching such yard limits that they should have their trains under control to avoid a collision in view of the fact that it was always possible that a train would there be standing upon the tracks. Because such yard limits were there

established it was not necessary for the rear brakeman when his train stopped to go back to signal a possible approaching train. If a train stopped on the tracks of the defendant at any point outside of yard limits it was the duty of the rear brakeman to proceed on the track back of the train with a signal for the purpose of protecting his train from collision from the rear and he could not, therefore, inspect the running gear and apparatus of his train at that time. It is not to be presumed, therefore, that trainmen will be required to run along the sides of their train at points upon the road where they do not stop except in case of accident or unforeseen circumstances. The space between the tracks over the farm crossing in question was directly in the path that the plaintiff as a brakeman was required to travel in doing the work that he was required to do. It appears without contradiction that it is not a brakeman's duty to inspect the running gear of his train every time it stops, but that it is his duty to inspect the running gear at certain stops that are made under general orders including the stop at Portage bridge. When stops are made outside of yard limits the time of the brakeman is wholly taken up in protecting the train from collisions, but in cases where a stop is made by general order and within yard limits their time is not so employed.

The defendant's superintendent for that part of its road, including the yard limits at Portage bridge, testified : " The conductor and his men are required to look over the wheels and the running gear of their trains whenever they stop long enough at any one point to permit its being done. That inspection usually takes place at points where the engine or engines stop for water."

The testimony of the superintendent that I have just quoted read with the testimony of the defendant's expert from which I have also quoted is express authority for the conclusion of the jury that it was negligence in the defendant not to cover such opening. On this particular train there were five men in the train crew. At Castile the engineer and fireman were engaged on their engine — the conductor

and head brakeman were assisting in the work of the second engine, and it left the plaintiff alone to inspect the train. When he left Castile he knew that the running gear at some point on the north side of the train needed attention and the attention which he gave it while the train was stopping at the bridge was in his immediate line of duty. A hot journal unless cared for may result in so burning out the bearings as to wreck the train. If the plaintiff under the circumstances disclosed had not inspected the north side of the train as he did while it was standing at the bridge, he would have been negligent in the performance of his duty.

The trial court was right in submitting to the jury the question whether under the circumstances disclosed it was not the duty of the defendant to cover the opening between the tracks in the yard limits at Portage bridge the same as it covered similar openings in its yard limits where cars are switched and trains made up.

This court has frequently held that a defendant's negligence was a question of fact in cases where the particular circumstances did not show a greater duty toward railroad employees than is shown in this case. (*Plank* v. *N. Y. C. & H. R. R. R. Co.*, 60 N. Y. 607 ; *Fredenburg* v. *Northern C. R. Co.*, 114 N. Y. 582.)

The question of the plaintiff's contributory negligence and of his assumption of the risk are questions of fact. (*Plank* v. *N. Y. C. & H. R. R. R. Co., supra ; Wallace* v. *Central Vermont R. R. Co.*, 138 N. Y. 302 ; Labor Law, section 202, formerly section 3, chap. 600 of the Laws of 1902 ; *Guilmartin* v. *Solvay Process Co.*, 189 N. Y. 490; *Clark* v. *N. Y. C. & H. R. R. R. Co.*, 191 N. Y. 416.)

The judgment should be affirmed, with costs.

CULLEN, Ch. J., HAIGHT and WILLARD BARTLETT, JJ., concur with WERNER, J. ; HISCOCK, J., concurs with CHASE, J. ; VANN, J., not sitting.

Judgment reversed, etc.