## LOONEY v. METROPOLITAN RAILROAD COMPANY.

ERROR TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 173.   Argued December 14, 15, 1905.—Decided February 19, 1906.

In an action for damages for personal injuries while the defendant has the burden of proof of contributory negligence, the plaintiff must establish the grounds of defendant's liability; and to hold a master responsible a servant must show by substantive proof that the appliances furnished were defective, and knowledge of the defect or some omission in regard thereto. Negligence of defendant will not be inferred from the mere fact that the injury occurred, or from the presumption of care on the part of the plaintiff. There is equally a presumption that the defendant performed his duty.

THE facts are stated in the opinion.

*Mr. Maurice D. Rosenberg* and *Mr. Alexander Wolf*, with whom *Mr. Simon Lyon* was on the brief, for plaintiff in error.

*Mr. J. J. Darlington* for defendants in error.

MR. JUSTICE McKENNA delivered the opinion of the court.

Action brought by plaintiff as administratrix of the estate of James F. Looney, deceased, against the defendants, for damages for the death of her intestate, alleged to have been caused by defendants. Judgment went against plaintiff in the Supreme Court of the District of Columbia, which was affirmed by the Court of Appeals.

After the plaintiff had rested her case the court directed the jury to return a verdict for the defendants. The correctness of this ruling is the question in the case.

The declaration consists of four counts. The first three allege the employment of the deceased by each of defendant

companies respectively. In the fourth the allegation is that he was rightfully and lawfully in the discharge of his duties.

Looney was employed as a "pitman" by the Washington and Great Falls Railroad Company (now the Washington and Electric Company), and was on the day of his death, July 28, 1901, in one of the "plow pits" located on the lines of the company, near its terminus, at Thirty-sixth street and Prospect avenue northwest.

The Metropolitan Company's line connects at this point with that of the Great Falls line. The latter company uses the overhead system. By this system the power is conveyed to the car by means of a "trolley pole" attached to the top of the car and made to touch the trolley wire when used to propel the car. The Metropolitan Company uses the underground system by means of a "plow," so called, projecting through a slot in the tracks to an underground current. The two companies have a trackage arrangement, whereby the cars of the Metropolitan Company run over the line of the other company. The cars of the Metropolitan Company, therefore, are equipped not only with a "plow" and mechanism for the underground system, but with a trolley-pole and mechanism for an overhead system. To attach these mechanisms to their respective systems it is necessary to run a car over an excavation on the line of the Great Falls Company known as the "pit." The "pitman" is thus enabled to remove the "plow" from a car to be transferred from the Metropolitan line to the Great Falls line, and adjust or attach the wires or "leads" necessary for the operation of the car over the Great Falls line. While doing this Looney was killed, the plaintiff contends, through the negligence of the conductor of the car in permitting the trolley pole to come in contact with the trolley wire, whereby a current of electricity was transmitted to the motive machinery. And this is the ground of negligence charged in the declaration. In every count it is alleged "before said intestate entered said plow pit it became the duty of the defendants, and each of them, to keep, or cause to be kept, the electric current so cut

off from said pit as not to injure the said intestate; and the plaintiff says that said intestate having entered said pit in obedience to said direction to him as aforesaid, said defendants negligently failed to keep, or cause to be kept, cut off, as aforesaid, said electric current from said pit while said intestate was therein for the purpose aforesaid, whereby and by reason of said negligence the said intestate was so severely shocked and injured by said electric current that he almost immediately died."

At the trial there was evidence given by the plaintiff of the arrangement between the defendant companies as to the exchange of cars and to the relation of their respective employés. On this evidence the parties base opposing contentions, the defendants contending that the conductor and Looney were fellow servants, the plaintiff contending that they were not. Both of the lower courts sustained the contention of the defendants. The Court of Appeals, besides intimated a belief that the testimony on behalf of plaintiff rather tended to show accident than negligence. If this be so, or if the evidence fails to establish whether the death was caused by accident or negligence the judgment should be affirmed, and it will be unnecessary to decide whether Looney and the conductor were fellow servants. We will assume for the purposes of the case that they were not fellow servants.

The accident was seen by two persons, Margaret Mawson and Helen Gertrude Coon. The former testified that she was sitting in her room on the second floor of her house, which is on Prospect avenue, seventy-five feet or more from the "pit." She saw the car turn the curve from Thirty-sixth street into Prospect avenue, and "that the trolley pole was up and the trolley wheel against the overhead wire, all the time after the car got into Prospect avenue until it stopped over the pit; that while the car was coming from Thirty-sixth street down to the pit she saw Looney, the deceased, enter the pit through the south trapdoor. That after the car stopped over the pit she saw him go up under the car and take the plow off. That

after he took the plow off she saw him go up under the car again and put the wires up in the car to connect with the overhead trolley; and that while he was in that position she heard him holler and drop down, and the motorman turned and said 'For God's sake, fix that trolley!' and the conductor then pulled the trolley down, but did not before that time.   .   .   . That the accident did not happen until after the car stopped and the deceased had removed the plow and had gone up under the car again and was putting up the wires. . That she saw the movements of the deceased under the car through the trap- door. That she could see his hands taking off the plow; could see nothing but his hands then; that after he took off the plow and went up under the car, she could see a part of his body above the surface of the street. That the pit was deep enough for a man to stand up in; that she heard no bell ring, nor signal of any sort; her hearing was good enough to hear a bell if one had been rung. That he had to use his hands to remove the plow and also put the overhead current on, and she saw him twist his hands when he got the shock."

Helen Gertrude Coon testified that she was a daughter of the preceding witness and lived with her; that she saw the accident from the front porch of the house, which was about on the level with the sidewalk of Prospect avenue. She saw the car run around the curve from Thirty-sixth street, come down the avenue and stop over the pit. She was not certain whether the pole was touching the wire before the car stopped over the pit, but the pole was touching the wire or came in contact with it while deceased was taking off the plow. "That her attention was directed to the fact of the trolley being in contact with the wire from the fact that the deceased gave a groan, and the motorman said 'For God's sake, pull that trolley down!' That some one said 'Pull the car off the pit!' That she saw deceased take the plow off and then go up under the car to throw the overhead current on. That after he took the plow off and was putting the overhead current on, she heard him groan. That she heard no bells or signals given.

That he had to use his hands to remove the plow and also put the overhead current on, and she saw him twist his hands when he got the shock. That she saw all this while looking under the car from where she was sitting on the porch. That they took the body up out of the pit over which the car had been standing."

A passenger on the car testified that he heard one bell ring, and immediately the conductor took the rope that holds the trolley rod in his hands, but he did not notice him do anything else. In about a minute and a half there "was a groan down in the hole and he jumped down and saw the man lying on his face." He heard some one say "For God's sake, hold the rod down; pull the pole down!"

Another witness testified that he lived on Prospect avenue, and was in front of his house lighting the fire in his automobile. He did not notice the car before it stopped. While it was standing over the pit he heard an exclamation and a groan, and some one said "Pull that trolley down!" After the exclamation he looked up and saw the trolley against the wire. He was about seventy-five feet from the car.

Another witness testified as to the manner of adjusting the plow and "leads," and the way a shock could be received by the pitman. It was to the effect that the wires used to connect the motive power with the overhead trolley are called "leads." Where the pitman takes hold of them to adjust them they are insulated by a covering of india rubber, but at the ends where they connect with other wires they are uninsulated and have to be so in order to take the current. If the pitman takes hold of them at the right place and there is no leak, he would not be shocked, even though they were connected with the trolley. "Wear and tear," a witness said who was experienced in removing and adjusting plows and wires, "will cause a leak in the insulation. A leak is when the electricity comes through a hole in the insulation, caused by the wear and tear or from the insulation being old or imperfect."

The same witness also testified "that the company furnishes

gloves in the pit with which to handle live plows and wires. But it is not customary or required to use the gloves except upon rainy days.  On bright days, the car, when over the pit, is supposed to be 'dead,' and you don't take off the plows with gloves; you can't do half your work with them.  That danger from electricity is increased from perspiration, rain or other moisture.  That the day of the accident was a bright, sunshiny day.  The accident occurred between two and four o'clock P. M."

If the trolley was on before the plow was disconnected and removed, the plow would be charged with the full voltage on the line.

A witness who had experience with the construction of electric railway systems, and was familiar with the action of electricity generally, and had experience in superintending the work of disconnecting a plow from an electric car and adjusting the wires to move an overhead system, testified that in his opinion as an expert that it would be the duty of a conductor to keep the trolley off the wire until he received some signal from the man beneath the car.

(1) It will be observed that the deceased did not meet his death while removing the plow.  Of this the testimony leaves no doubt.  (2) He received the electric shock while adjusting the leads.  It follows from the first proposition that the trolley pole was not in contact with the trolley wire when the plow was removed.  The argument of plaintiff assumes the contrary, and, indeed, is based entirely on the assumption that the deceased received his death stroke when removing the plow.

Two questions arise on the second proposition.  The leads are insulated except at the ends that go into the connection; they are necessarily uninsulated there in order to take the current.  But it was not necessary for the deceased to touch the uninsulated parts in making the connection, and, unless touched, no shock would have been received, even though they had been connected with the current by reason of the trolley being in contact with the wire, *unless there was a leak in the*

*insulation arising from defective construction or wear and tear in use.* Granting, therefore, that the conductor was negligent, one of two things was necessary to cause the accident: a leak in the insulation, or the act of the deceased in touching the uninsulated ends of the leads. Either one or the other was a necessary condition. If the first existed, the defendants may be charged with liability. If the second, they are exonerated. The burden of proof becomes a factor. The plaintiff in the first instance is not required to prove that the deceased was free from contributory negligence; in other words, the burden of proof of contributory negligence is on the defendant. But on the other hand, plaintiff must establish grounds of liability against the defendant. To hold a master responsible, a servant must show that the appliances and instrumentalities furnished were defective. A defect cannot be inferred from the mere fact of an injury. There must be some substantive proof of the negligence. Knowledge of the defect or some omission of duty in regard to it must be shown.

In *Texas & Pacific Railway Company* v. *Barrett*, 166 U. S. 617, the plaintiff (defendant in error in this court) was a foreman in charge of a switch engine, and was injured by the explosion of a boiler of another engine. There was evidence tending to prove that the boiler was and had been in a weak and unsafe state by reason of the condition of the stay bolts, and that if a well-known test had been applied the condition of the bolts would have been discovered. The Circuit Court instructed the jury that the mere fact of the injury received from the explosion would not entitle plaintiff to recover; that, besides the fact of explosion, he must show that the explosion resulted from the failure of the railroad company to exercise ordinary care either in selecting the engine or in keeping it in reasonable safe repair. The court also instructed the jury that the burden of proof was on the plaintiff throughout the case to show that the boilers and engines that exploded were improper appliances to be used on its railroad by the defendant; that by reason of the particular defects pointed out and in-

sisted on by the plaintiff the boiler exploded and injured him, and the plaintiff was ignorant of the defects, and did not by his negligence contribute to his injury. Passing on these instructions, this court said, that they laid down the applicable rule with sufficient accuracy and in substantial conformity with the views of this court expressed in prior cases which were cited.

Plaintiff in the case at bar introduced no evidence whatever of a defect in the leads or that leaks were likely to occur, or the amount or degree of inspection necessary to discover them, or that there was an omission of inspection. The case was probably brought and tried on a different theory. It was argued in this court on a different theory. It was argued on the assumption that the deceased was killed when removing the plow. The assumption is directly in the teeth of the testimony. "The accident did not happen until after the car stopped and the deceased had removed the plow and had gone up under the car again and was putting up the wires." (Testimony of Margaret Mawson.) And to like effect is the testimony of Miss Coon. "She saw deceased take the plow off and then go up under the car to throw the overhead current on. That after he took the plow off and was putting the overhead current on, she heard him groan." And she saw him "twist his hands when he got the shock."

The declaration does not charge a defect in the leads. It charges the negligence to have been in the failure "to keep, or cause to be kept, cut off" the electric current while the deceased was in the pit, "whereby and by reason of said negligence the said intestate was so severely shocked and injured by said electric current that he almost immediately died." In other words, the cause of death was the negligent act of permitting the trolley pole to come in contact with the trolley wire.

But, granting plaintiff is not limited by her declaration, nevertheless she has not satisfied the requirements of law in her proof. A plaintiff in the first instance must show negli-

gence on the part of the defendant. Having done this; he need
not go farther in those jurisdictions where the burden of proof
is on the defendant to show contributory negligence. In other
words, if there is no evidence which speaks one way or the
other with reference to contributory negligence of the person
killed, then it is presumed that there was no such negligence.
Thompson on the Law of Negligence, sec. 401; *Baltimore &
Potomac R. R. Company* v. *Landrigan*, 191 U. S. 461; *Texas &
Pacific Railway Company* v. *Gentry*, 163 U. S. 353. But the
negligence of a defendant cannot be inferred from a presump-
tion of care on the part of the person killed. A presumption
in the performance of duty attends the defendant as well as
the person killed. It must be overcome by direct evidence.
One presumption cannot be built upon another. *Douglas* v.
*Mitchell*, 35 Pa. St. 440; *Philadelphia &c. Railway Company*
v. *Henrice*, 92 Pa. St. 431; *Yarnell* v. *Kansas City &c. Railroad
Company*, 113 Missouri, 570.

*Judgment affirmed.*