**Joseph Woods, Appellee, v. Chicago, Burlington & Quincy Railroad Company, Appellant.**

**Gen. No. 25,671.**

1. MASTER AND SERVANT—*sufficiency of evidence to support finding as to cause of injury to servant.* In an action by a railroad switchman for an injury alleged to have been received as the result of a coupler breaking and striking him as he stood beside the track, evidence received and *held* to warrant the jury in finding that the coupling was broken by being pulled as the train started, instead of by the impact when the coupling was made, and that plaintiff was struck by the coupling.

2. MASTER AND SERVANT—*applicability of res ipsa loquitur to injury by breaking of drawbar.* The doctrine of *res ipsa loquitur*

discussed in connection with the breaking of the drawbar of a coupling when the train was being pulled after the coupling was made.

3. MASTER AND SERVANT—*sufficiency of evidence to show negligence of master under Federal Employers' Liability Act.* In an action for injuries received by plaintiff when a coupling broke and a piece of it flew out and struck him, testimony by plaintiff that the knuckles were worn flat and of two other witnesses that there was a defect in the drawbar was, though the latter testimony was contradicted, sufficient to warrant the jury in finding that defendant was negligent, either under the Federal Employers' Liability Act or the Safety Appliance Act.

4. DAMAGES—*when not excessive in action for injury to servant.* In an action against a railroad for personal injuries received by plaintiff, an employee, evidence that, at the time of the injury, plaintiff was 41 years of age and weighed 198 pounds; that his wages were $115 a month; that he was taken to a hospital and put in a cast; that he spent most of the next 5 months in a chair; that he could not go to bed but slept in a chair; that he walked some with the aid of crutches or canes down to the time of trial; that he has pains in the back all the time on account of which he seldom can stay in bed more than 2 or 3 hours at a time; and that since his injury he has done no work, the jury were warranted in finding a verdict for plaintiff in the sum of $16,700.

Appeal from the Superior Court of Cook county; the Hon. JOSEPH SABATH, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1919. Affirmed. Opinion filed October 5, 1921. Rehearing denied October 17, 1921.

J. A. CONNELL and RUSSELL B. JAMES, for appellant; R. B. SCOTT, of counsel.

FINN & MILLER, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal by the defendant from a verdict and judgment in the sum of $16,700, recovered by the plaintiff in an action on the case brought by him to recover damages for injuries which he alleges he sustained while employed by the defendant as a switchman at its Morton Park Yards in Cook county, Illinois.

The declaration contains, altogether, six counts, but, the claim of the plaintiff may be considered as based upon two Acts of Congress, one known as the ''Federal Employers' Liability Act,'' and the other as the ''Safety Appliance Act.'' They are, as far as is material, as follows:    (Federal Employers' Liability Act) section 1 (Cahill's Ill. St. ch. 114, ¶ 321), Liability of railroads, etc.:

### Federal Employer's Liability Act.

''Sec. 1.   Liability of railroads for injuries to employees.   That every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment.''    (35 Stat. L. 35.)

### Safety Appliance Act.

''Sec. 2.   That on and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.''

As to the Federal Employers' Liability Act, it is alleged that the defendant negligently permitted a coupler on one of its cars to be worn and defective, so that it was liable to break, and that while the plaintiff was doing his duty, working about the particular car on which the alleged worn out and defective coupler was, the coupling broke and a piece of it flew, or was thrown out, and struck and seriously injured him.

As to the Safety Appliance Act, it is alleged that the defendant failed to equip one of its cars with a coupler "coupling automatically by impact," as required by the Act, but, on the contrary, allowed the coupler to be and remain in a dangerous, weak and defective condition, so that it was liable to and did break while in use, and that a piece of it flew, or was thrown out, and struck and seriously injured the plaintiff.

On December 10, 1917, shortly after 7 p. m., the plaintiff was working as a switchman in the yards of the defendant near 52nd avenue and Morton Park. He was working with a switching crew composed of Engineer Korto, Fireman LeBrun, Foreman Miller, Switchman Stewart and himself. The tracks of the defendant run east and west and are numbered from the south to the north. They are separated far enough to permit a switchman to work between them when cars are standing on each track.

The engine of the train in question had just backed in on the track (the third from the south) and was coupling up a string of nineteen or twenty cars, preparatory to taking them off that track, in the work of making up a train.

The plaintiff and other switchmen got off the engine between the tracks 2 and 3, the plaintiff remained at the head and near the engine, while Miller and Stewart went back along the string of cars. The plaintiff coupled up the engine and the first car, and then

walked back two or three cars, at which point he found the cars separated a distance of 5 or 6 feet. They were standing still. He went in between the two cars and opened the knuckles of the simplex coupling on both cars, pulled the drawbars open, so they would line up to make the connection. He says the couplings were worn, that the lips of both knuckles were worn, that they were worn flat from use, that ordinarily they are round, that the one on the east car, the one that subsequently broke, was worn more than the one on the west car.

It was after 7 o'clock in the evening, and was dark and cold. The three switchmen were all between tracks 2 and 3, and at that point cars were standing in both tracks. The engineer was looking out on the same side of the train, and took signals from the switchmen which they gave with their lanterns. After the plaintiff opened up the knuckles, he stepped out from between the cars, being then between tracks 2 and 3, and gave the engineer the "come back" sign. The cars then came back and he says he saw them coupled up, that the coupling was made very easily.

Miller and Stewart proceeded towards the rear end of the train and in the regular course of their work opened up the knuckles of various couplings, and signaled for the engineer to back up. Their signals would be repeated to the engineer by the plaintiff, who was between them and the engine. When the entire train was coupled up, the switchmen at the rear end of the train gave a "go ahead" signal with his lantern. The plaintiff then gave a similar signal to the engineer, and the train started. The plaintiff says that after the train started up, slowly, the drawbar, meaning a piece that broke off the coupling, hit him in the back, about the waist line, and threw him about 10 feet across track 2; that he fell face first; that he tried but could not get up; that he shouted and the engineer jumped off the train, came back, picked up his lantern and

gave the conductor a signal not to go ahead; that the conductor and engineer picked him up, took him over to the engine, put him on, and took him to the St. Anthony's Hospital, where he remained about 3 weeks. On cross-examination he said that after he gave the signal to the engineer, the train started and then broke apart 4 or 5 feet; that he felt something strike him in the back; that he was knocked across track 2, most of his body being on the other side, knocked about 10 feet; that he did not get up until the engineer and Miller helped him; that they put his arms across over their shoulders and carried and dragged him along and put him on the engine; that the thing that hit him was lying 2 or 3 feet west of the west end of the car, standing on track 2; that he saw it when he was being helped across the track.

The engineer Korto testified that he was on the south side of track 3, sitting in the engine cab; that the three switchmen got off and walked back between tracks 2 and 3; that each of the switchmen had a lantern in his hand, and one of the men with the lantern remained near the head end of the train about two car lengths back; that the other two switchmen went farther back; that in response to signals he pushed all the cars together; that he got a signal with a lantern from one of the switchmen at the rear end to go ahead; that he started his engine; that the train pulled in two, and that the switchmen near the engine immediately gave him a "stop" signal with his lantern; that the switchman then set the lantern on the ground; that he heard some one groaning and got down on the ground, went back about half a car length from the engine and found Woods leaning up against a car on track 2 between tracks 2 and 3; that Woods did not have a lantern in his hand, but that Woods' lantern was about two car lengths back of him on the ground; that he then walked back to the place where the lantern had been placed on the ground, a distance of

nearly two car lengths, and gave the rear switchman a "stop" signal, a "cut off" signal; that Woods was on his feet, and he helped Woods up to the engine; that by the time he got to the engine Foreman Miller and Switchman Stewart came up; that Woods was not over between tracks 1 and 2, lying upon the ground, nor was he lying upon the ground at all; that he did not pick him up from the ground at all; that he was the first man to Woods; that after he and Woods got up to the rear of the engine, Woods took a walk around a few steps, rubbing his back; that after they switched out the car with the broken coupler, they took the plaintiff to the hospital.

The foreman Miller testified that he gave a signal from the rear end to pull ahead; that as the train, consisting of nineteen cars, did not move he gave another signal; that a "stop" and "cut off" signal were given at the head end and he went forward to see what was the matter; that he found the engineer and the plaintiff between tracks 2 and 3, the plaintiff leaning against a car on track 2; that he said he had been hurt; that the car with the broken coupler was then switched out; that there was a broken piece of the jaw of the coupler lying on the ground between tracks 2 and 3; that the plaintiff was then taken to the hospital.

Stewart, a switchman, testified that he was at the rear end; that he gave a signal to go ahead; that then the cars—nineteen, eleven of which were loaded—moved out 2 or 3 feet and then stopped; that he walked forward about ten car lengths to see what was the matter; that the engineer and Miller were just picking up the plaintiff and supporting him on their shoulders, his legs dragging; that he saw that the coupler had broken at the jaw and part of the casting, weighing about 25 or 30 pounds, was lying on the ground near track 2.

LeBrun, the fireman, was on the left side of the engine and saw nothing of what took place. In a writ-

ten statement he said that in coupling the cars before the injury there was no particularly hard bump; also, that he helped the engineer to put the plaintiff on the engine, and that he was taken to the hospital.

As to the broken coupling and the piece that it is claimed flew out: Stewart said that the area of the surface of the fracture was 4 or 5 inches by 9 or 10 inches, the latter being from the top to the bottom of the jaw; that part of the break appeared new and part rusty, dark, the latter being 2 or 3 inches from the top; that the rusted part was 2½ inches to 3 inches in width; that he looked at the broken piece on the ground and also at the part of the drawbar that was on the car. On cross-examination he said that there was a bad spot in the drawbar; that there was a dark spot that extended down into the break about an inch and a half in width and about 2 inches long.

Miller said that the broken coupling was on the west end of the car; that he examined the broken drawbar and it was a new break; but on cross-examination said that there was one little dark place in it.

A consulting engineer, Prior, an expert, familiar with all kinds of couplers, said, in answer to an hypothetical question, that in his opinion the piece could be caused to break and fly off by reason of the worn condition of the knuckle; that it could be caused to fly off by reason of the incipient fracture, or as a result of both.

Walters, an expert, called by the defendant, said that if there were a dark spot two inches by a half to an inch and a half it would have a tendency to weaken the part. He, also, said if it would break in a forward pull, that shows there must have been a crack or defect. Mansha, a car inspector, said he inspected the coupling on the car in question on November 26, 1913, and that the knuckles were "O. K." and in good condition; that when he examined it it was locked. Priesmeyer, a master mechanic, who saw it in

the evening, after the injury, and examined the draw-bar, said that the guard arm was broken off and that it was a clean break.

Neither the piece of the drawbar, nor the coupler from which it was broken, was put in evidence.

The jury, after being given certain instructions, brought in a verdict of $16,700 in favor of the plaintiff, and, upon that, judgment was entered. This appeal was taken therefrom.

Inasmuch as, under the Federal Employers' Liability Act, negligence is determined by the common law of the State, the question, as far as the application of that act is concerned, here is whether there is sufficient credible evidence to maintain the verdict. It is a case of *res ipsa loquitur*, plus the testimony of certain witnesses as to the appearance of the broken end of the piece of the drawbar which struck the plaintiff, and the testimony of certain experts as to the strength, action and history of similar couplings when in use. Some question is made as to the whereabouts of the plaintiff at the time he claims he was struck, but we are of the opinion that there is ample evidence in the testimony of the plaintiff, Stewart and Miller, to justify the jury in believing him to have been standing opposite the coupling at the time it broke. Some question also is made that the jaw was not broken when being pulled as the train started up, but may have been broken by the impact of the cars when backing up and going together. The plaintiff said that he saw them couple up, and that afterwards, when the engine started up, the train broke in two. The engineer said that after he started up he could feel the train part. Stewart said that after he gave the signal the cars moved out 2 or 3 feet and then came to a dead stop. We are of the opinion that there was ample evidence for the jury, if it saw fit, to believe that the drawbar was broken by being pulled and not by the impact when coupling.

We, therefore, assume that there was ample evidence for the jury that the engine and cars in front first moved backward; that the coupling was then made; that the engine and train shortly afterwards started up and moved forward a few feet; that the train then broke and a piece of it was thrown out to the south and was found on the ground practically opposite the gap where the train had broken in two. As to whether the plaintiff was struck by it, there is his testimony, and that remains uncontradicted. No one else saw him struck, as it was dark and the rest of the crew were working some distance away from him. We are bound, therefore, to assume that the jury had the right, if it felt so constrained, to believe his evidence.

There remains the question as to the alleged negligence. If the proof of negligence were dependent solely upon the doctrine of *res ipsa loquitur,* that is, if there were no evidence further than that of the pulling of the train, the breaking of the drawbar, and the striking of the plaintiff by the piece broken off, it might be necessary to determine the scope of the Federal Safety Appliance Act and whether the mere breaking of the coupling was, of itself, sufficient evidence of negligence. But, here, there is more. And, the decision in *Minneapolis & St. L. R. Co. v. Gotschall,* 244 U. S. 66 [14 N. C. C. A. 865], would, in our opinion, lead us to conclude that an application of the doctrine of *res ipsa loquitur* would show a violation of the Federal Safety Appliance Act. We find ample evidence, which was submitted to the jury, tending to show that the coupling was defective and in such a condition as must be considered to be the result of negligence on the part of the defendant. Apt language in the *Gotschall* case, *supra,* is the following:

"The jury, under an instruction of the court, was permitted to infer negligence on the part of the company from the fact that the coupler failed to perform

its function, there being no other proof of negligence. It is insisted this was error, since, as there was no other evidence of negligence on the part of the company, the instruction of the court was erroneous, as, from whatever point of view looked at, it was but an application of the principle designated as *res ipsa loquitur,* a doctrine the unsoundness of which, it is said, plainly results from the decisions in *Patton v. Texas & P. R. Co.,* 179 U. S. 658, 45 L. Ed. 361, 21 Sup. Ct. 275, and *Looney v. Metropolitan R. Co.,* 200 U. S. 480, 50 L. Ed. 564, 26 Sup. Ct. 303, 19 Am. Neg. Rep. 627. We think the contention is without merit because, conceding in the fullest measure the correctness of the ruling announced in the cases relied upon to the effect that negligence may not be inferred from the mere happening of an accident except under the most exceptional circumstances, we are of the opinion such principle is here not controlling in view of the positive duty imposed by the statute upon the railroad to furnish safe appliances for the coupling of cars.''

In the instant case there is the evidence of the plaintiff that the knuckles were worn flat, and the evidence of Stewart and Miller that there was a defect in the drawbar. The latter it is true was denied by Priesmeyer, but there was evidence for the jury, and they might quite reasonably have concluded that the defect existed and that, therefore, the defendant was negligent. In the *Gotschall* case, *supra,* the court held there was negligence where the injury was caused merely as a result of a coupling coming apart. *A fortiori,* here with the additional evidence of a defect in the drawbar, there was negligence.

It is contended by counsel for the defendant that it was error to give for the plaintiff the following instruction:

"The court instructs the jury that at the time of the accident in question there was in force a certain United States Statute, which is as follows: 'Sec. 2. On and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common

carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars.'

"And you are further instructed that this is a duty imposed by law upon every railroad company engaged in interstate traffic, and if you find from a preponderance of the evidence in this case that the defendant railroad company was engaged in interstate traffic, and that the coupling in question failed to couple automatically by impact, as alleged in the additional count of plaintiff's declaration, and that as a proximate result of such failure, if any, of the coupler in question, to couple automatically by impact, was the proximate result of the injury to the plaintiff, then you should find the defendant guilty."

Inasmuch as it is argued by counsel for the defendant that the jaw might have been broken off by the impact when the cars came together, and argued, further, that, although there is no testimony in the record to show it, it is still a reasonable deduction from an application of the laws of mechanics; it follows, as a matter of right, that it was entirely proper for the jury to be instructed that if the coupling failed to couple automatically by impact and as a proximate result of such failure the plaintiff was injured, the defendant was guilty. *Gotschall* case, *supra*. Then, too, as we are of the opinion that there was sufficient evidence of negligence either under the Safety Appliance Act, or the Federal Employers' Liability Act, that is, as at common law, the contention of counsel as to instruction No. 11 is untenable.

It is contended that the verdict is excessive. At the time of the injury the plaintiff was 41 years of age and weighed 198 pounds, was 5 feet 11 inches in height and was in good health. His wages were $115 a month. He had been a switchman for about a year and a half, and prior to that for about 19 years a painter and paperhanger. The night of the injury he was taken to

St. Anthony's Hospital. The doctors put a cast of some kind around his waist. He was in the hospital for 3 weeks. He then went home and spent most of the next 5 months in a Morris chair, his wife taking care of him. He did not go to bed but slept in a chair. He then walked some with the aid of crutches, and afterwards, down to the time of the trial, with the aid of two canes. He says his back pains him all the time, that he can rarely stay in bed at night more than 2 or 3 hours on account of the pain in his back. Since he was injured he has done no work.

It is claimed by counsel for the defendant that there is evidence that there was no discoloration of the external muscular structure of the back and that the plaintiff was not injured as he claims. But X-rays were taken, and Dr. Pease, an X-ray expert of 20 years' experience, and Dr. Eberhart, an X-ray expert of 18 years' experience, both testified that an X-ray plate of the plaintiff's back showed a comminuted fracture of the fourth lumbar vertebrum, and some injury to the fifth. That is disputed by Dr. Kiernan and other doctors called by the defendant. The evidence on the subject of injuries is very voluminous, and, of course, it would be superfluous here to give either a full resumé or analysis of it. It was presented to the jury and they have considered it and fixed the damages. Are we now justified in saying that the amount is excessive?

Under the circumstances, after a careful consideration of the matter, we are of the opinion that the judgment must stand.

Finding no error in the record, the judgment is affirmed.

*Affirmed.*

O'CONNOR, P. J., and THOMSON, J., concur.