**Buck RAMSEY, Appellant,**

v.

**COLDWATER CATTLE COMPANY, Inc., Appellee.**

**No. 7597.**

Court of Civil Appeals of Texas.

Amarillo.

March 28, 1966.

Rehearing Denied May 9, 1966.

John J. Watts and Clyde C. Bishop, Odessa, for appellant.

Simpson, Adkins, Fullingim & Hankins, Gibson, Ochsner, Harlan, Kinney & Morris, Amarillo, for appellee.

CHAPMAN, Justice.

This is an appeal by Buck Ramsey, plaintiff below, from a judgment for Coldwater Cattle Company, Inc. based upon a verdict instructed by the court after the plaintiff had introduced his testimony and rested his case.

It is a common law action arising out of an injury suffered by appellant in his capacity as a cowboy employee for appellee, Coldwater Cattle Company, Inc., a cattle ranching corporation. Appellant was employed in about July 1962 as a cowboy for appellee. Bob Brandenburg was general manager of the corporation, but Tim Kegans was the foreman in charge of getting the work done on the ranch and had complete authority to hire and fire cowboys. He hired Buck Ramsey.

On or about October, 9, 1962, after Buck had caught a horse by the name of Squirrel to go to work with Kegans and two other cowboys, the foreman asked him if he had not ridden Squirrel since he had ridden Cinnamon. Kegans told him he should try to keep all his horses ridden in turn, "and said why didn't I ride Cinnamon." Buck put an easy stop bridle or hackamore on Cinnamon which Kegans told him the other cowboys had used on the horse and seemed to work better on him, saddled him, and as he started to mount the horse, he started pitching before Buck secured himself in the saddle. After bucking for more than 700 feet he finally threw his rider and as a result thereof appellant was seriously injured. It is for damages growing out of such injuries that suit was filed.

Since the case is before us upon a judgment based upon an instructed verdict, we believe it is proper to first state the rules by which we must be guided in considering the evidence in order to determine if the court committed reversible error in refusing to submit any issues to the jury.

■ In making this determination an appellate court must view the evidence in the light most favorable to the losing party, and must indulge against the instruction every inference that may properly be drawn from the evidence.[1]

The next logical question to be decided is whether Tim Kegans was a vice principal or a fellow servant.

■ The Supreme Court of Texas has consistently held for many years that in the class of cases such as the one in question (not affected by legislation regarding fellow servants) that if a fellow servant, in addition to his authority to direct and supervise the work of those under him, has authority to hire and discharge such subordinate servants, he becomes a vice principal and his wrongful act, negligence, unskillfulness or default is that of the master.[2] " * * * except in instances where such negligence is related to those duties of the master which are regarded as nonassignable and nondelegable, such as furnishing the servant a reasonably safe place to work, or reasonably safe instruments with which to perform his service, or the selection of careful and competent coemployés * * *" Lantry-Sharpe Contracting Co. v. McCracken, 105 Tex. 407, 150 S. W. 1156. See also McCorstin v. Mayfield, Tex.Civ.App., 274 S.W.2d 874 (dismissed by agreement.)

Perhaps the nearest case to the instant case concerning the type work being performed is Waring v. Harris, Tex.Civ.App., 221 S.W.2d 345 (writ ref.). This was a suit by a cowboy for injuries received in flanking a calf preparatory to dehorning, vaccinating and marking the calves on a ranch. He contended that Roy Joiner, the foreman, was a vice principal and not a fellow servant, that Joiner was negligent in letting the calf into the pen to be flanked because it was too large, and that such negligence was the act of the master.

■ The evidence in that case showed that the foreman, Roy Joiner, did not have the authority to hire and fire the other ranch hands, whereas, in our case, Tim Kegans not only had that full and complete authority but the responsibility of getting the work done on the ranch. We believe this brings him clearly within the rule laid down in the *Lantry-Sharpe* case and reaffirmed by the Supreme Court in the *Waring* case by a stamp of "writ refused." These rules long adhered to by the Texas Supreme Court and applicable to the class of cases into which the instant case falls are founded upon the common law.[3] Accordingly, we hold that Tim Kegans was a vice principal of appellee.

It becomes necessary now to look to the facts relating to the injury to determine if appellee did that which an ordinary prudent person would not have done under the same or similar circumstances, or failed to do that which such a person would have done under the same or similar circumstances, which proximately caused appellant's injuries.

Appellant testified that when Tim Kegans employed him there was not anything par-

1. Dunagan v. Bushey, 152 Tex. 630, 263 S.W.2d 148; McCarty v. Moss, Tex.Civ. App., 225 S.W.2d 883 (error ref.); Houston Transit Co. v. McQuade, Tex.Civ.App., 223 S.W.2d 64 (error ref.); Speights v. Deon, Tex.Civ.App., 182 S.W.2d 1016 (error ref.); James v. Missouri-Kansas-Texas R. Co. of Texas, Tex.Civ.App., 182 S.W.2d 921.

2. Hugo, Schmeltzer & Co. v. Paiz, 104 Tex. 563, 141 S.W. 518, 519; Young v. Hahn, 96 Tex. 99, 70 S.W. 950.

3. Lantry-Sharpe Contracting Co. v. McCracken, supra; common law rule of decision adopted by the Texas Act of Congress, January 20, 1840, presently Article 1, Texas Revised Civil Statutes, 1925.

ticular said with respect to his furnishing all his gear necessary to his work but that he understood he would have to furnish the essential gear. He also testified that Mr. Kegans asked him when he employed him if he had a bridle and a bronco hackamore.

"Q. Is that some kind of bridle like this in this suit?

"A. Similar; but a bronc bit doesn't have the shank or levers.

"Q. Doesn't have a bit to go into the animal's mouth?

"A. No.

"Q. This easy stop didn't have a bit either?

"A. No, sir.

\* \* \*

"Q. You knew you were going to furnish that cowboy gear?

"A. Yes, sir.

"Q. And that included saddle and spurs?

"A. Yes, sir.

"Q. And included whatever kind of bridle you wanted to use.

"A. Yes, sir, whatever kind of bridle that I was going to use.

"Q. And you knew you were going to furnish them?

"A. Yes, sir.

"Q. And you did furnish them?

"A. Yes, sir.

"Q. Well, during the time you worked there at the ranch did Coldwater Cattle Company furnish you any gear at all?

"A. Just food, no gear, just food."

Mr. Kegans testified the hackamore or easy stop belonged to him and that appellee did not furnish any riding gear of any type to him or any other cowboy; that the bridle or easy stop was a home-made piece of equipment; that it had been given to him; that it was in the same condition as far as having repairs made on it as when it was given to him.

Buck testified that after Mr. Kegans mentioned to him that the easy stop was the bridle they had been using on Cinnamon and had asked if he wanted it, he asked Kegans for permission to use it. He also testified that if one of the cowboys needed a piece of gear he didn't have it was customary to borrow it from some other cowboy. Buck also testified:

"Q. Well, when he handed it to you, you looked at, and it looked in order, didn't it?

"A. It looked all right."

Though the record shows that appellant was an experienced cowboy and had ridden many bucking horses successfully, even some in rodeos, for some unexplained reason he lost his left rein when the horse first started bucking. If we understand Buck's testimony, it was not until Cinnamon had bucked approximately 700 feet that the right shank of the easy stop bridle broke. Since he was using only the right rein for any balance the reins would give him, it follows that double pressure was placed on that side of the easy stop and on the shank that broke.

With respect to the bridle, appellant alleged negligence in the following particulars, each of which he asserted was a proximate cause of his injuries:

"(c) In furnishing him an easy stop bridle which was unfit for the purpose for which it was intended;

"(d) In furnishing him an easy stop bridle unsafe for use;

"(e) In failing to warn the plaintiff that the bridle was unsafe;

"(f) In furnishing him a bridle which the defendant knew had been welded and was defective and unsafe for use or in the

exercise of ordinary care would have known that the bridle was defective and unsafe for use;

"(g) In failing to make a reasonable inspection of the bridle, a specialty tool, to determine if said bridle was safe for use;"

We do not believe there was sufficient evidence of negligence on the part of appellee concerning the easy stop bridle or hackamore to present to the jury. In the first place Buck himself testified he asked to use the bridle. Secondly, he understood he was to furnish his own gear. Thirdly, the evidence showed without contradiction that appellee never furnished him any gear during any of the time he worked there, never furnished any other cowboy any riding gear of any type, and the evidence is without contradiction that when one cowboy did not have a piece of gear he needed he borrowed it from another cowboy. Additionally, the evidence shows the same easy stop had been used by other cowboys on the same horse without incident and that when it was handed to Buck he looked at it before he put it on the horse and it looked in order.

We have not been cited to any supreme judicial expression in Texas on the exact question of whether a cowboy contracting to furnish his own gear, none of which is furnished by the master to any cowboy, relieves the master of negligence, where the cowboy requests the use from a vice principal of the latter's own personal gear, nor have we found any such case in our research.

The Supreme Court of Mississippi in Texas Co. v. Mills, 171 Miss. 231, 156 So. 866, has said:

"The master's duty to furnish his servants with safe instrumentalities with which to do their work is not a contractual, but a common-law, duty, which the master cannot delegate to another. *The one exception, if exception it be, to this rule, is that a servant injured by a defect in an instrumentality which he himself had contracted to furnish, * *, relieves the master of any duty to him relative thereto.* Hegwood v. J. J. Newman Lbr. Co., 132 Miss. 487, 96 So. 695; Hooks v. Mills, 101 Miss. 91, 52 So. 545; Waterman-Fouke Lumber Co. v. Miles, 135 Miss. 146, 99 So. 759; Edward Hines Lbr. Co. v. Dickinson, 155 Miss. 674, 125 So. 93." (All emphases herein are ours).

Buck admitted he understood he was to furnish his essential gear. If the easy stop was essential to the riding of Cinnamon, then by contract it would have been his duty to furnish it. In any event, the record is without contradiction that, at least impliedly, the appellee had a definite understanding with all cowboys that it was not to furnish any of their riding gear and the cowboys understood that fact.

The Dallas Court of Civil Appeals in Great Atlantic & Pacific Tea Co. v. Garner, Tex.Civ.App., 170 S.W.2d 502 (ref. w. m.) has also said: "'* * * the master may relieve himself of liability by intrusting to his servant the duty of inspection and care in respect of a place * * * by contract he is bound to make safe.'" Buck admits he looked at the easy stop when it was handed to him and that it looked in order. There is not any evidence in the record indicating he was obligated to use the easy stop. To the contrary, the evidence here is without contradiction that Buck requested the use of the vice principal's easy stop after Kegans told him other cowboys had been using it on Cinnamon. It is also without contradiction that appellee furnished no riding gear to any of the cowboys, including Tim Kegans. It is also without contradiction that the exact same bridle or hackamore had been used before by other cowboys on the same horse without incident. We believe these uncontradicted facts themselves relieved the trial court of any responsibility to submit issues to the jury upon negligence concerning the easy stop. Additionally, even if it could be said that appellee was

responsible for the bridle owned, not by it, but by a vice principal, the use of which was requested by appellant, Buck was still required to inspect a common piece of gear with which he was familiar as an experienced cowboy. The San Antonio intermediate appellate court [4] in a case involving a defective ladder, has said in quoting from the Supreme Court of Texas: " 'A master is not required to inspect the common tools and appliances which are committed to the custody of a servant who has the capacity to understand their character and uses.' "

In Southwestern Telegraph & Telephone Co. v. Tucker, 102 Tex. 224, 114 S.W. 790 the Supreme Court of Texas has said: "We know of no rule of law that imposes upon the master the duty of looking after defects in objects with which the servants are working, where there is nothing to indicate that any such defect existed."

■ Where the master, as in this case, at least by implied contract furnished nothing in the way of riding gear to any cowboy, including its vice principal, it does not appear reasonable that it would be under any obligation to inspect such vice principal's personal gear which it did not furnish.

Under the record before us, we feel we have no choice except to hold there was not any probative evidence to go to the jury on the negligence of appellee concerning the easy stop bridle.

■ Appellant next asserts error of the court in holding as a matter of law that appellant could not recover under the doctrine of discovered peril.

Only two people were witnesses to the unfortunate incident, Tim Kegans and appellant. The cowboys, Wafford and Moore, had already ridden out of sight. Buck did not know the exact proximity of Kegans to him when he mounted Cinnamon but had the impression the foreman was near by waiting for him. He admitted Kegans may have had his back "partly toward him."

There is testimony to the effect that trained rodeo horses can be forced to run into a bucking horse with their shoulders and stop him from bucking. Kegans testified the horse, Pocawana, on which he was mounted could not be forced up to a bucking horse, that he tried to get his horse up to Cinnamon but that Pocawana "just wouldn't let me." Buck admitted that sometimes " * * * an old horse, ranch horse, will go up to a bucking horse and sometimes he will not." It is understandable that he was too busy trying to stay on Cinnamon to actually know what Kegans did to try to help him out of his position of peril.

"Q. As a matter of fact, Buck, you don't know whether Tim Kegans tried to get to you to get the reins, or not?

"A. Like I say, I can't testify to what his actions were.

"Q. You don't actually know whether he did or not; whether he may have actually been trying to get to you to get your reins?

"A. Might have been.

"Q. In fact, you just don't know?

"A. No, but I—

"Q. That's all—

"Mr. Watts: Let him go ahead.

"A. Sir?

"Mr. Watts: Go ahead and finish your answer.

"A. I never saw him that close to me.

"Q. Well, you don't know whether he spurred his horse at a gait to get up to you and grab the reins or not?

"A. No."

It has been textually stated that:

"The doctrine of discovered peril or last clear chance means that the last chance must be a clear one. It implies

4. Swearingen v. Bell, Tex.Civ.App., 307 S.W.2d 132 (N.W.H.).

thought, appreciation, mental direction, and lapse of sufficient time to act effectually on the impulse to save another from injury. And, if a person, after having become aware of the danger of injury, could not have averted the calamity *by the use of the available means,* he is not responsible for its occurrence." 40 Tex.Jur.2d 628, sec. 113.

The most recent Texas Supreme Court expression cited by the statement just quoted is R. T. Herrin Petroleum Transport Co. v. Proctor, 161 Tex. 222, 338 S.W.2d 422. There the court said:

"\* \* \* one who discovers another in a perilous position and fails to use *the means at his disposal* to prevent injury is liable for the injuries resulting from such failure."

With respect to the requirement that it be shown that the party charged with negligence discovered the perilous position in time to avoid the injury *by the use of means available at the time,* see also Ruggles v. John Deere Plow Co., Tex.Civ.App., 146 S.W.2d 456, 460 (writ ref.) by our court and Texas & P. Ry. Co. v. Breadow, 90 Tex. 26, 36 S.W. 410, 412.

█ In Turner v. Texas Co., 138 Tex. 380, 159 S.W.2d 112, the Texas Supreme Court stated the three essential elements of discovered peril are (1) the exposed condition brought about by the negligence of the plaintiff; (2) the actual discovery by defendant's agents of his perilous situation in time to have averted—*by the use of all the means at their command, commensurate with their own safety*—injury to him; and (3) the failure thereafter to use such means.

That court in Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W.2d 561, 562 said:

"The quantum of proof required of the plaintiff on these elements of discovered

peril in order to entitle him to have them submitted to the jury was such facts and circumstances as taken together with all reasonable inferences therefrom constituted some evidence of probative force of their existence. White v. White, 141 Tex. 328, 172 S.W.2d 295; Stevens v. Karr, 119 Tex. 479, 33 S.W.2d 725; Fitz-Gerald v. Hull, [150] Tex. [39], 237 S.W.2d 256."

There is just no probative evidence that Kegans could have extricated Buck from his perilous position by the use of all means at his command, commensurate with his own safety. He testified his horse, Pocawana, "was not too safe" and that he just would not go up to the bucking Cinnamon.

Accordingly, we hold there was not any probative evidence to raise the doctrine of discovered peril.

The next series of issues urges error of the trial court in holding as a matter of law that appellant failed to show negligence in furnishing the horse Cinnamon for appellant to ride. He alleged negligence:

"(a) In furnishing him a horse which was unsafe to ride;

"(b) In failing to warn the plaintiff that the horse was unsafe;"

The evidence shows by appellant himself that in 1958 he started doing cowboy work off and on and that when he went to work for appellee he was an experienced cowhand. Buck testified in effect that to the best of his memory, when he went to work the ranch gave him a mount [5] of nine using horses and three broncos. Among those using horses was Cinnamon, a young horse four or five years old. Buck had ridden Cinnamon a short time before around in the corral and out in a little horse pasture for about five minutes "to check him out and see what he would do." He did not discover

---

5. In ranch language a "mount," probably a colloquialism, consists of the group of horses furnished a cowboy to work with in his regular duties as a cowboy on a ranch. Webster's New Collegiate

Dictionary, 2d Ed., Copyright 1949, G. & C. Merriam Co. defines the word as: "\* \* \* to furnish with animals for riding."

anything dangerous about him but did notice that probably his regular bits didn't work well in the horse's mouth. He admitted Cinnamon was a good, healthy, sound animal and there is not any intimation anywhere in the record to the contrary. Kegans' testimony was to the effect that he had no information of the horse having ever pitched or having been unsafe in any respect.

A rancher from Monahans by the name of Thornton testifying for appellant said in effect that horses should be well broken and when they are they normally will not pitch. He admitted "there are always exceptions with these horses."

We have been cited to only one Texas horse case from which any analogy might be made. The Fort Worth intermediate appellate court in Robb v. Gilmore, Tex. Civ.App., 302 S.W.2d 739 (ref. N.R.E.) held:

> "A master's duty in furnishing a horse or other animate thing to a servant for doing the master's work stands upon the same basis as furnishing tools or other inanimate instrumentalities. Warner v. Oriel Glass Co., 319 Mo. 1196, 8 S.W.2d 846, 60 A.L.R. 448; George H. Hammond Co. v. Johnson, 38 Neb. 244, 56 N.W. 967; Central Lumber Co. v. Porter, 139 Miss. 66, 103 So. 506, 42 A.L.R. 221; Arkansas Smokeless Coal Co. v. Pippins, 92 Ark. 138, 122 S.W. 113. The master is bound to use reasonable diligence to furnish a safe animal, and he is bound by what he actually knew or by the exercise or reasonable diligence might have known. Marks v. Columbia County Lumber Co., 77 Or. 22, 149 P. 1041."

We are not willing to concede that the mere fact that a young cow horse on a large ranch, which breeds and trains its own remuda, bucks on occasion is evidence that such horse is unsafe for an experienced cowboy to ride or that the ranch would be negligent in furnishing such a horse to an experienced cowboy. In fact, we believe it is common knowledge that in a remuda of fifty horses, as shown here, some of them would be inclined to pitch on occasion. It is a risk incident to the work which he was employed to do and was assumed by him when he accepted the job as a cowboy just as flanking a calf was a risk assumed in Waring v. Harris, supra. This is especially true when we consider that Buck was furnished three broncos in his mount. We believe it is common knowledge that young horses with high spirit are sometimes prone to pitch when first saddled on cool mornings. But even conceding the rule of law quoted in Robb v. Gilmore, supra, is applicable to a ranching operation such as that of appellee, there still is not any negligence shown here in the furnishing of Cinnamon. Appellant had never heard of Cinnamon pitching. Kegans admitted that he had never checked with Keith Keeney, who broke him to ride, about his conduct, but he said " * * * I have seen them ride him out there every few days, you know. If a horse is ordinarily bad or anything like that we get shut of him." Additionally, the mare in Robb v. Gilmore, supra, was shown to have been physically unsound for ranch work because of a fistula in her left shoulder, admitted by the employer.

In a much stronger case for the claimant than the instant case, which involved a bull rather than a horse, the Waco Court of Civil Appeals in Dawkins v. Van Winkle, Tex.Civ.App., 375 S.W.2d 341 held there was no evidence of probative force that the animal had vicious propensities which were known to the owner. Yet, in that case a ranch employee had been attacked by the bull once before his fatal injury when he had punched him with a pitchfork. The record is completely without proof here that Cinnamon had ever shown any dangerous propensities before the occasion in question, or had ever bucked with any rider before the date on which he injured appellant. Therefore, we are compelled to hold appellant's points urging neg-

ligence in the furnishing of Cinnamon as a part of appellant's mount are without merit.

The physical condition in which the unfortunate incident here under consideration has left this previously strong, healthy, virile young man would tear the heart strings of anyone studying the case, but we are bound by the facts before us and the rules of law applicable thereto rather than by our emotions.

For all the reasons stated, we do not believe negligence against appellee, which was a proximate cause of the serious injuries and resulting damages to appellant, was shown in the record.

Accordingly, the judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING

It appears from appellant's extended motion for rehearing, supplemental argument and various briefs that we failed to properly communicate our holdings in our original opinion. We are accused, and perhaps with some justification, for making statements which indicated we were drawing a distinction between the vice-principal and appellee. It is very difficult for this writer to formulate an opinion in a case with close questions and verbose briefs on the part of the complaining party without making some obiter dicta statements. In studying other opinions it is obvious that the fault is not uncommon at all levels of both the state and federal judiciary. We clearly held that Kegans is a vice-principal under the facts of this case. If any statements we made, which were necessary to the conclusions reached, may be interpreted as holding his conduct was not that of the appellee, we disavow such statements with the exception of our application of Texas Co. v. Mills, supra, to our case.

We are first taken to task for the citation and application of the *Waring* case to our own. Since both appellants were admittedly engaged in ranch work and since appellant agrees with our vice-principal holding his complaint could only be applicable to our statement concerning assumption of risk. We still hold when appellant accepted employment as an experienced cowboy on a large ranch such as appellees (which breeds and trains its own cowhorses) he assumed the risk that in a remuda of fifty horses there would be some young, high-spirited horses such as Cinnamon that would buck on occasions, just as the appellant in the *Waring* case accepted the risks incident to flanking calves when he accepted employment as a cowboy. This assumption is further compelled by the fact that appellant was assigned for his regular work three broncs in addition to his mount of nine using horses, thus indicating the responsibilities of the cowboys to train and ride broncs.

On Page 24 of his motion for rehearing appellant infers that we held Cinnamon was one of the three broncs assigned Buck to ride. Obviously, counsel has not very carefully read our opinion. We clearly stated that appellant "testified in effect that to the best of his memory, when he went to work the ranch gave him a mount of nine using horses and three broncos," and that Cinnamon was one of the using horses. His exact words were, " * * * he gave me three broncos, and nine using horses, for regular work" and then stated Cinnamon was not one of the broncos.

As in his numerous other briefs, appellant quotes extensively from Robb v. Gilmore, supra, the only Texas horse case cited concerning negligence in furnishing Cinnamon. The facts are so completely different as to furnish no guide in our case except as to some general rules of law. The mare responsible for the injury in that case had a diseased condition in her shoulder called a fistula that had required serious surgery and which left her without free movement in her shoulder muscles, causing her to stumble consistently while being ridden. On the contrary, Cinnamon was a strong, healthy, able-bodied

horse with no physical defect of any type, so far as this record shows.

After stating in Robb v. Gilmore that a master's duty in furnishing a horse or other animate thing to a servant for doing the master's work stands upon the same basis as furnishing tools or other inanimate instrumentalities, the court then held the master "is bound by what he actually knew or by the exercise of reasonable diligence might have known." We think it is significant that in Robb v. Gilmore the court also held:

"The master is bound to use reasonable diligence to furnish a safe animal, and he is bound by what he actually knew or by the exercise of reasonable diligence might have known. Marks v. Columbia County Lumber Co., 77 Or. 22, 149 P. 1041.

" 'To hold a master responsible, *a servant must show that the appliances and instrumentalities furnished were defective. A defect cannot be inferred from the mere fact of an injury. There must be some substantive proof of the negligence. Knowledge of the defect or some omission of duty in regard to it must be shown.'* Looney v. Metropolitan R. Co., 200 U.S. 480, 26 S.Ct. 303, 305, 50 L.Ed. 564. *'Neither the existence of a legal duty nor a breach thereof can be presumed, but must be proved.'* Railway Express Agency v. Robinson, Tex.Civ.App., 162 S.W.2d 984, 987." (Emphases added).

With respect to the furnishing of Cinnamon, compliance by appellant with the rules of law just quoted in the last paragraph are wholly lacking in the record. There is just no substantive proof of negligence concerning Cinnamon with respect to the type ranching operation under which Buck accepted employment, nor is there a showing of an omission of duty in regard to discovering the characteristics of the horse.

The courts do not hold that more than reasonable diligence must be exercised by the master in furnishing a safe animal, but reasonable diligence. Kegans testified " * * * I have seen them ride him out there every few days" and that if a horse is bad they dispose of him. We know of no better method to exercise diligence in determining dangerous propensities in a cowhorse than to see him at work every few days. We recognized in our original opinion that an appellate court must view the evidence in the light most favorable to the losing party but this rule does not preclude the requirement that the one seeking recovery must prove a cause of action. There is just no proof here that Cinnamon was not a sound, healthy horse or that he had ever shown dangerous propensities. Buck had ridden him once before the occasion in question without incident and admitted he never heard of him pitching with anyone.

In addition to his reliance upon Robb v. Gilmore, supra, which in our opinion does not militate against our findings and conclusions, but supports them, appellant, as part of his motion for rehearing, urges Williams v. Hofer, 30 Wash.2d 253, 191 P.2d 306, and Padilla v. Winsor, 67 N.M. 267, 354 P.2d 740. Both are easily distinguishable from our case. In the former the claimant was a fifty-seven year old man hired principally to do farm work. The horse responsible for his injury had been purchased at a public auction. The owner without actually having any knowledge of the horse or the former owner assured the employee the horse was "broken to ride;" whereas, in our case Kegans had known Cinnamon since he was foaled and there is not any evidence that he knew of any dangerous propensities in the horse, though he had seen him ridden every few days. The facts in Williams v. Hofer are just so different to the facts in our case as to furnish no authority for appellant's contentions.

In the *Padilla* case the employee was fifty-three years of age. The horse re-

sponsible for the injury had thrown the employer at least once before he told the employee the horse was gentle. We have no testimony of any such knowledge on the part of appellee or Kegans in our case. Additionally, that ranch was a two-horse operation in the *Padilla* case and the owner told the employee he had two horses on the ranch and they were gentle. In our case the ranch was a fifty-horse operation that bred, raised and had the horses trained by the cowboys. This is evidenced by the fact that Buck was assigned three broncs for his regular work in addition to six using horses.

 Now, to the easy-stop bridle. It is without contradiction that Buck understood as part of his contract of employment that he was to furnish all his riding gear, which included a bridle and bronc hackamore. There is no probative evidence that Kegans ever required any cowboy to use his individual easy-stop bridle or hackamore, and it is without contradiction that on the occasion in question he merely mentioned to Buck that the hackamore was the one the other cowboys had been using on Cinnamon and asked him if he wanted it. Buck then requested the use of it. There is not any probative evidence that he was ordered to use it; required to use it, or, in our opinion, even encouraged to use it. Kegans simply made the suggestion that other cowboys had used it on the horse and it seemed to work well. So far as this record is concerned, the decision was left to Buck, and he requested the right to use it and examined it before he put it on the horse. Additionally, foreseeability is completely lacking. The same hackamore had been used on the horse by the other cowboys without incident. There is no reason to believe that the vice-principal could have foreseen that an experienced cowboy such as Buck would lose one rein nor could have foreseen that the very hackamore with which Cinnamon had been ridden many times before would break on the occasion in question.

The record in this case has been diligently reviewed, the testimony (including appellant's many admissions against interest) carefully weighed, and the rules of law, such as there are applicable to this particular case, carefully studied. All legal inferences required have been indulged in favor of appellant. Still, we are unable to find from the facts of this particular type ranching operation any grounds of negligence which could be a proximate cause of appellant's very serious injuries.

The motion for rehearing is overruled.