# CORAY v. OGDEN UNION RY. & DEPOT CO.

No. 7001.  Decided May 12, 1947.  (180 P. 2d 542.)

See 25 C. J. S. Death, Sec. 80; 35 Am. Jur. 666, 711.

*Bryan P. Leverich, H. B. Thompson, M. J. Bronson,* and *A. U. Miner,* all of Salt Lake City, for appellant.

*Clyde & Coray, Rawlings, Wallace & Black,* and *Brigham E. Roberts,* all of Salt Lake City, for respondent.

PRATT, Justice.

This case comes before this court on an appeal from a jury verdict and judgment of the lower court in favor of the plaintiff and against the defendant in the amount of $40,000. The defendant and appellant alleges error by the lower court which raises the question of the sufficiency of the evidence to support the verdict.

This action is governed by the Federal Employers' Liability Act, 45 U. S. C. A. § 51, the pertinent section of which is as follows:

45 U. S. C. A. § 51,

"Every common carrier by railroad while engaging in commerce between any of the several States * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

The greater part of the evidence in the case is uncontradicted. It shows the following facts: The deceased, a man 30 years of age, weighing between 180 and 190 pounds and in good health, was on the night of his death working with a switching crew in the Ogden Union Railroad Yards at Ogden, Utah. The switching crew was composed of the following persons; Wilson, foreman; Walker, engineer; Schofield, fireman; Cude, pinpuller; York, fieldman; and Conine (deceased), fieldman. The switching operation in which the crew was engaged, involved the kicking of freight cars from a track known as U. P. lead track No. 21 onto what

are known as hold tracks. Conine and York as fieldmen were stationed at switches leading from the auxiliary lead tracks into the hold tracks. Conine was to take care of lining the switches on hold track Nos. 1, 2 and 3, setting the brakes on the freight cars which were kicked onto those tracks and was to keep said cars from running out of the hold tracks to the north. York was to do the same on hold tracks Nos. 4, 5, 6 and 7. All the tracks in use in the switching operation slope slightly to the north; that is the direction from which the cars were kicked on the night of the accident. As a consequence, the cars on the hold tracks would, unless braked or blocked, run out to the north. A "kicked car" as that term is used by railroad workmen, means a car which after being pushed by the engine to the required momentum is cut loose to coast to position. In the instant case, these cuts were so handled. It is done by signal from the switch foreman upon which signal the engine is stopped and the cars allowed to proceed along the tracks under their own momentum. The switching crew had kicked some cars from U. P. No. 21 onto hold tracks 1, 2, 3, 4, 5, 6 and 7, and at about 2:10 a. m. the engine had coupled to it three cars loaded with wheat which were all to be put on hold track No. 2. Mr. York was in the vicinity of the switch which controlled his share of the tracks, and Mr. Conine was about 20 feet away on the west side of hold track No. 2 talking to Mr. York. The kick was executed at a speed which is somewhat in conflict. Walker, the engineer, estimated 10 to 12 miles per hour; Wilson, the foreman, estimated 4 to 5 miles per hour. At any rate, York saw the cut of three loaded wheat cars come even with Conine and saw Conine either on, or going to get on, the first car of the cut as it proceeded south onto hold track No. 2. York heard a collision as the kicked cut came into contact with the car or cars on hold track No. 2 and saw "Mr. Conine's light come down off the cars." York thought it came off the first car of the three car cut as it proceeded south. York ran over to the light and discovered Conine's body. Conine's body was lying on the stomach with his head down under his chest.

There was a big gash in his head. The body had been dragged about 26 feet as was shown by the marks on the ground along side the east rail of hold track No. 2—the side of the tracks opposite where Conine was standing talking to York. There was some blood back at the beginning of the drag marks and a spot of blood where the body finally came to rest. The body was lying parallel to the rails the near side being about five inches from the east rail. It was at about the center of the middle car of the three loaded cars which had just been kicked. It had been dragged by some part of the cars catching in the back of Conine's jumper—his jumper was gathered up around his shoulders. Conine's cap and lantern were near the spot where the drag marks started.

If Conine were dislodged from the end of the southermost car of the kicked cut of cars when it came into collision with the car or cars on hold track No. 2, as the testimony seems to indicate that he was, the cars proceeded up hold track No. 2 a distance of between 85 and 90 feet after the impact before they came to rest. This distance is determined by measuring the distance from the south end of the kicked cut to the point where the drag marks of Conine's body begin.

The kicked cut of cars and the other three cars on hold track No. 2 at the time the kicked cut entered said track were examined by the railroad officials after the accident. All six cars were coupled together and the brakes on the southern most car were set as were the brakes on the northernmost car—set by York after the accident. None of the six cars had been moved between the time of the accident and the time the officials examined them. They discovered that the six cars were all in good mechanical condition. They also found that something had very recently wiped some dirt and grease from the east wheels and trucks of two of the cars and from the south and east wheel and truck of a third car. It looked to the officials as if the dirt and grease had been wiped by a cloth. The parts wiped were so near the ground that Conine's body could have wiped off the dirt

as the cars passed it. The relative position of these three cars to the other cars on the tracks is especially significant. They were: The car with which the kicked cut of cars coupled when the collision occurred, the lead car on the kicked cut and the middle car of the three car cut. Only the front wheel and truck of this latter car was wiped and said wheel and truck were the only ones on that car that had passed Conine's body. It would seem that from this evidence the defendant intended to show that the northernmost car on hold track No. 2, before the collision, had passed Conine's body after it was on the ground—no one examined Conine's clothing to ascertain if it showed grease or dirt marks.

This evidence produced by the defendant, if accepted by the jury at its face value, would tend to show that York must have been mistaken when he testified that Conine, immediately before the collision, was on or getting on the cut of kicked cars. The time element and distances involved are such that as a practical matter Conine could not have been on or getting on the kicked cut of cars when they came between him and York and a few seconds later, i. e., at the moment of impact be on or in front of the northernmost car of the three cars at that time on hold track No. 2.

Incidentally, if the jury accepted the defendant's evidence for the purpose for which it was offered and therefore believed that Conine was on the south end of the northernmost car of the cars already on hold track No. 2 when the collision occurred, from that they could find that the kicked cut of cars moved approximately 130 feet after the collision which would justify a further conclusion that the impact was with greater force than the plaintiff's evidence indicated it to have been.

Assuming that all the testimony given at the trial by both the witnesses for the plaintiff and those for defendant was accepted by the jury as true, the effect would be to create uncertainty as to just how and from what Conine fell. The jury, however, because of this uncertainty would not be precluded from finding in favor of the plaintiff. It

would be their duty to reconcile the conflict in the evidence if possible, and if they could not they would be free to accept either the testimony of York, the fieldman, or the testimony of the officials who examined the cars involved after the accident. Or if they chose they might accept all the testimony and reject as improbable part of the inferences that might be drawn from that testimony. In this selecting process the jury, as reasonable men, would be determining what the preponderance of the evidence proved.

If there is evidence from which the jury, as reasonable men, can find the existence of a disputed fact, it is not speculation simply because there is equally strong evidence from which they could have arrived at an ■ opposite conclusion. The law of the United States covering this situation is as stated by Mr. Justice Douglas in the case of *Ellis* v. *Union Pacific Railroad Co.*, 67 S. Ct. 598, 600:

> "The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury. *Tennant* v. *Peoria & P. U. R. Co.*, 321 U. S. 29, 64 S. Ct. 409, 88 L. Ed. 520; *Lavender* v. *Kurn*, supra, [327 U. S. 645, 66 S. Ct. 740, 90 L. Ed. 916]. Once there is a reasonable basis in the record for concluding that there was negligence which caused the injury it is irrelevant that fair-minded men might reach a different conclusion. For then it would be an invasion of the jury's function for an appellate court to draw contrary inferences or to conclude that a different conclusion would be more reasonable. *Lavender* v. *Kurn*, supra, 327 U. S. at page 652, 66 S. Ct. at page 743 [90 L. Ed. 916]."

In the case at bar the jury may have reconciled all the evidence by simply finding that the wiping was not done by Conine's body. Or, if they believed that it was done by his body, they may have disbelieved York when he said he saw Conine just before the cut of cars came onto hold track No. 2 and found that Conine was on the cars on hold track No. 2 at the time the kicked cut came into collision with them and that he was there in the performance of his duties as fieldman and exercising due care for his own safety, but that the impact was so great as to dislodge him.

It is admitted that at the time of the accident the deceased was engaged in the performance of his duties and where there is no evidence as to just how the accident occurred, as would be the situation here if the testimony of York is disbelieved in its entirety, the decedent ■ would be presumed to have been exercising due care for his own safety at the time of the accident. *Tennant* v. *Peoria & P. U. Ry. Co.*, 321 U. S. 29, 64 S. Ct. 409, 88 L. Ed. 520; *Looney* v. *Metropolitan R. Co.*, 200 U. S. 480, 26 S. Ct. 303, 50 L. Ed. 564; *Atchison, Topeka & Santa Fe R. Co.* v. *Toops*, 281 U. S. 351, 50 S. Ct. 281, 283, 74 L. Ed. 896.

It seems to be agreed by both parties in this case that kicking cars at such a rate of speed that they will travel beyond a point on the tracks where the switch foreman knows that said tracks are clear is a dangerous operation, i. e., it is a negligent operation, and that damage ■ might be caused either to equipment or personnel by such kicks. There is ample evidence in this case from which the jury could have found that the kick here executed traveled beyond a point Wilson, the switch foreman, knew or should have known was clear, and further that the kick traveled past the track which was clear and came into collision with another car or cars then on said track. And as a final step the evidence is sufficient to support the necessary finding that as a result of this negligent operation Conine met his death by having been dislodged from his position on the kicked cars or on a car then on hold track No. 2 by the impact or collision between the said kicked cut of cars and the car or cars then on hold track No. 2.

The fact that the jury might have some difficulty determining just which car deceased rode at the time, does not relieve the situation from an operation which could be characterized as unanticipated or as being without the normal in that the speed or force of this kick was excessive. See our discussion in the case of *Ayres* v. *Union Pacific R. Co.*, 111 Utah 104, 176 P. 2d 161.

The judgment of the lower court is affirmed. Costs to the respondent.

McDONOUGH, C. J., and WADE, J., concur.

LATIMER, Justice (concurring in result).

I concur in the result. However, in order to better illustrate the differences separating the parties to this action, I prefer to refer to the pleadings and to set up some of the facts not referred to in the majority opinion.

Plaintiff commenced this action as the administrator of the estate of Eugene Conrad Conine, deceased. The action was founded on the rights and remedies afforded by the Federal Employers' Liability Act. Plaintiff alleged that the defendant acting through its agents committed three separate and distinct acts of negligence. First, kicking three cars loaded with wheat south on hold track No. 2 at a rate of speed that was excessive. Second, kicking the cars down hold track No. 2 without being certain the track was clear and the movement could be made in safety. Third, kicking instead of shoving the three cars down hold track No. 2 without knowledge of the location of other cars then on the track. The amended complaint further alleged that as a result of the negligent operation of the switching movement as above set forth the three moving cars came into contact with other cars on the track with sufficient force to cause the deceased to fall or be thrown from the car upon which he was riding. The fall and resulting injuries are alleged to have caused his death.

It is not necessary to analyze in detail the evidence with respect to appellant's negligence. A reference to the facts set forth in Mr. Justice PRATT'S opinion will disclose sufficient evidence was produced to justify the jury in finding that the foreman, Mr. Wilson, made the switching movement at a speed as high as 12 M. P. H.; that he made the movement when he could see only a limited distance south on hold track No. 2; and that the last movement made on this track was a kick rather than a shove.

Expert witnesses who were familiar with the physical conditions existing in the yards where the accident took place testified for both parties. Some testified that the switching

operation as described by some members of deceased's crew was unsafe and not in accordance with the standards of reasonable care for the safety of employees, while other witnesses testified to the contrary. This conflict merely made a question of fact for the jury, and its determination of this phase of the case is controlling. It is immaterial that this court might draw a contrary inference or feel that another conclusion is more reasonable. *Lavender* v. *Kurn*, 327 U. S. 645, 66 S. Ct. 740, 90 L. Ed. 916.

In order to recover in this action, it is necessary that plaintiff prove not only the negligence of appellant, but also that such negligence was the proximate cause in whole or in part of the fatal accident. Probative facts from which the causal relation is proven or reasonably inferred must be presented. As stated by the U. S. Supreme Court in *Tennant, Administrator,* v. *Peoria & P. Union Ry. Co.,* 321 U. S. 29, 64 S. Ct. 409, 411, 88 L. Ed. 520:

"The essential requirement is that mere speculation be not allowed to do duty for probative facts after making due allowance for all reasonably possible inferences favoring the party whose case is attacked."

The evidence being sufficient to justify the jury in finding defendant guilty of negligence, the only remaining question is whether or not from the facts presented to the jury the causal relation of the negligence of appellant to the death of Conine has been established or can be reasonably inferred. This is the question that requires a detailed summary of some additional facts.

The accident happened at 2:10 a. m., and it was fairly dark although there were flood lights that lit up the general area. The last person to see the deceased alive was York, who was a fieldman working a cooperative arrangement with deceased. At this time, according to York, Conine was approximately one-half car length north and west of him, and they were talking back and forth. The last switching operation involved the kicking of seven cars, and all movements with which we are concerned were made from

north to south. The first car of these seven, the N. Y. C. car, was kicked onto hold track No. 2; the next three cars were kicked toward hold tracks Nos. 4, 5 and 6; and the last three cars onto hold track No. 2. The cars kicked onto hold track No. 2 are the ones with which we are immediately concerned. According to York, he saw the deceased on or fixing to get on the last three cars kicked on hold track No. 2. He was under the impression that the deceased was on the first or southernmost of these three cars, which would be on the A. T. & S. F. car. As the deceased was on the west side of the track and York was on the east side, the first of the three cars as they went south on the track cut off his vision of Conine. York then turned his attention to the cars that had been kicked onto the hold tracks he was working, and paid no more attention to the cars on track No. 2 until he heard a collision or coupling. Upon hearing the coupling of cars on track No. 2, he turned towards this track, saw deceased's light falling from an estimated height of six feet, and saw it make three spins. He immediately gave the engineer a pinwheel, or fast backing movement, and then proceeded over to the hold track No. 2. There he found Conine lying on the east side of the track in about the center of the C. & O. car and approximately four or five inches east of the east rail. Conine appeared dead at that time. He was lying almost parallel to the rail, his head to the south, and his jumper was up around his shoulders, giving the appearance of having hooked on some object and being pulled from the normal jacket position to a rolled-up position around the shoulders. There was a drag mark which was clearly visible for approximately twenty feet, plus the length of Conine's body, and there were marks in the cinders for another fifteen feet which were not the ordinary marks of shoes, but gave the appearance of being caused by something having been dragged. The lantern of deceased was found some 18 to 20 feet north of where the body was found, and his cap approximately two feet north of the lantern. The lantern was broken but was still burning. After the accident it was found that

there were six cars coupled together on hold track No. 2. Going from south to north, the farthest car to the south was a Great Northern, the next to the north was a P. F. E., then the N. Y. C., then the A. T. & S. F., then the C. & O., and finally the Pennsy. Except for the facts that the brake was set on the Great Northern car and that all cars were coupled together, the two cars on the south can be forgotten about. The next car to the north, N. Y. C., however, becomes important in this drama. It was the single car kicked down the track just before the last three. Its brakes were not set and the hand brake was located on the south end, west side of center. It was the first car starting from the south end of the six that had the dirt and grease wiped off its wheels or journal boxes. It also had some threads or small pieces of cloth on bolts of the journal boxes located on the east side. The marks appeared on the east side of both the north and south trucks of the N. Y. C. car, the north and south trucks of the A. T. & S. F. car, and only the south trucks of the C. & O. car. As you proceed to the north from the N. Y. C. car the marks grew progressively lighter. The position of the deceased was such that the wiping effect could have been caused by his apparel, and the threads could have been pulled from his clothes. However, no inspection was made of his clothes to determine the presence or absence of grease or dirt or the presence or absence of tears or rends. The markings did not appear on the trucks of the cars to the north of where deceased was found, and did not appear on the west side of any of the cars. The distance from where York last saw the deceased to where he was found was approximately 200 feet, and the distance from where deceased was last seen to the point where he was knocked to or fell to the ground was approximately 165 feet.

Having detailed some of the facts I deem essential to this decision, the question then presents itself as to whether or not they support the charge that the alleged negligence of appellant proximately contributed to the death of Conine. The case was submitted to the jury on the following theory:

(1) That deceased mounted a car on hold track No. 2 for the purpose of setting the brakes. (2) That while on the car the string of three loaded cars came into unusual collision with a car on track No. 2. (3) That the unusual collision was due to the negligence of appellants in its switching operations; and (4) That the unusual collision was the proximate cause of deceased's being thrown from the car.

Respondent's theory is that deceased took one of two courses of action. Either he mounted the N. Y. C. car to set the brakes and keep it from rolling to the north, or he mounted the A. T. & S. F. car for the purpose of securing the last three cars, and that an unusual collision ensued between the three cars and the N. Y. C. car which caused deceased to be knocked from the car upon which he was riding. Appellants' theory seems to be that it is mere speculation and conjecture as to how deceased was killed; that there is no evidence that he ever mounted any car and that respondent failed to make a submissible case on causation.

The Supreme Court of the United States in the case of *Lavender* v. *Kurn*, 327 U. S. 645, 66 S. Ct. 740, 744, 90 L. Ed. 916, pretty well disposes of the contention in regard to conjecture and surmise. Said the court:

"It is no answer to say that the jury's verdict involved speculation and conjecture. Whenever facts are in dispute or the evidence is such that fair-minded men may draw different inferences, a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference. Only when there is a complete absence of probative facts to support the conclusion reached does a reversible error appear. But where, as here, there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion."

The evidence detailed demonstrates there is testimony from which it might be inferred that deceased was on the cars. York testified he saw him either on or fixing to get on the cars. True, there was evidence from which the jury might find that York was wrong in his statement as to

which car he saw Conine get on, or that Conine ever got on any car. If the clothes worn by Conine wiped the grease off the wheels and journal boxes on a car farther to the south than the one York testified he saw Conine mount, then York was in error as to which car Conine actually got on. It must be remembered that just prior to the accident the N. Y. C. car had been kicked down the track, and it only preceded the other three cars by a short space of time. York had some work to do on his own tracks and it is not unreasonable for the jury to say that Conine mounted the N. Y. C. car and that York was confused as to which car deceased mounted. The ladder and hand brake were on the south and west of the N. Y. C. car and if Conine were doing what he was supposed to have been doing this is the place he would have been located if actually on this car. That he was knocked to the east of the track is not an impossibility or even an improbability. While the platform is west of the center line of the car, it is entirely conceivable that a person standing there, knocked off by an impact and falling a vertical distance of approximately twelve feet, could be pitched far enough to the east to fall a half track width from the brake platform.

If the jury concluded this was the car that Conine mounted and he was pitched off the southern end, the physical facts after the accident as testified to by appellant's witnesses would be consistent and would indicate that Conine's jumper caught on the bolts of the journal box on the south trucks of the N. Y. C. car. These would be the first trucks to reach him and the presence of thread and wiping marks would be consistent with this theory. Also, the drag marks and wiping marks on the trucks of the other two cars could be easily accounted for. Apparently, after having been dragged a distance of about 20 feet the deceased's clothing became disentangled from the south trucks or journal box of the N. Y. C. car. The north trucks of the car would then pass him, and from his position when found he was close enough to the east rail so that his clothing would touch part of the truck assembly on the remaining cars passing by his body. Both

trucks of the next car would pass his body and there were wiping marks on these. Conine was found in the center of the next car so that only the south trucks would pass his body and these bore evidence of having rubbed against cloth of some kind. No marks appeared on the north trucks of this car.

If we take the other situation and accept York's story that Conine mounted the first car of the last cut of three, the only inconsistent inference in the record is the wiping marks and the threads on the trucks of the N. Y. C. car. This car being to the south, if Conine mounted a car moved in later and to the north, he could not have been thrown far enough to cause these markings. However, while the jury could reasonably infer these markings were produced by Conine's presence near the track, it could reasonably accept York's statement and infer that some other piece of cloth had rubbed against the car parts. No inspection was made of Conine's clothing to determine the presence or absence of grease or of tears or rends. While the markings on the trucks and journal boxes and the location of Conine's body lend weight to the inference that his clothes did come into contact with the undercarriage of the cars, the testimony by York that he mounted the A. T. & S. F. car would discredit the inference. It therefore follows that the jury could reasonably find that Conine was on the N. Y. C. car, was knocked off and his clothes were responsible for the marks, or it could find he was on the A. T. & S. F. car and his clothes were not responsible for the marks. Either conclusion is reasonable and the jury was at liberty to choose the one it considered most appropriate.

Appellant complains that there was no evidence to establish that Conine was ever on a car, or better, perhaps, that the evidence produced by both parties shows the impossibility of his having been there. Appellant in this connection fails to give full faith to the testimony and the reasonable inferences therefrom. As previously stated, no one saw Conine get on a car. This is not decisive or even necessary. The most that York would say was that he was on or fixing

to get on. He fixed the location of this place as approximately 165 feet north of where Conine fell, or was knocked to the ground. In this situation the jury could, and we must, take the evidence most favorable to respondent. Such being the case if a speed which witnesses claimed to be negligence is used as a basis for determining time element, the speed of the three cars could be taken as eight miles per hour. At this speed there would be approximately 13 seconds from the time Conine was fixing to get on until the coupling or collision. A faster speed would leave less time but if we were to take the fastest speed testified to, namely 12 M. P. H., there would be 9½ seconds for Conine to climb to the brake platform before the impact. Regardless of the speed used, there would be sufficient time to climb the ladder and get on the brake platform. In the sequence of events, the next scene is York seeing Conine's lantern fall from an estimated six feet, and making three spins. The witness who saw that was not undecided about what had happened. He knew something unusual had happened, and his acts spoke louder than his words. His first acts were to give the engineer a fast "pin-wheel"—the signal for fast backing, and then to rush over to where Conine lay dead. Even though the witness was unable to testify that he saw Conine on the car, there wasn't any doubt in the witness' mind that a tragedy had happened, and it happened where it could be seen by one standing to the east of the track. There are only two probable ways by which Conine could get from the west side of the track to the east. Either he had to walk in front of the cars or he had to go over. The former is eliminated by the testimony of York that the cars passed between himself and Conine, and cut off his vision of the deceased, and the further testimony of witnesses for appellant that they inspected all six cars thoroughly and found no markings other than those found on the trucks, wheels, and journal boxes. Had Conine been hit by one of the cars, the physical evidence would have so indicated. Agents for the railroad diligently searched for every available clue on the ground and on the cars, and the markings previously referred to were all they could find.

The location of Conine's cap and lantern, the starting point of the drag marks, are strong evidence of the place where Conine fell to the ground. These were found in a place where Conine's duties required him to be, and he was performing the duties required by his employment. Under these circumstances a presumption exists that he was exercising due care for his own safety at the time of his death. When the facts reflected by this record are added to the reasonable inferences and presumptions the respondent is entitled to rely on, there is a reasonable basis for the jury to find that deceased was on a car.

The last link in the chain of causation is the force of the impact between the cars. Without an unusual impact, there would be no reasonable basis for concluding that deceased was thrown from a car. Appellant cites and relies on *Pennsylvania R. Co.* v. *Chamberlain, Adm'r,* 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819. In that case the Supreme Court of the United States held the evidence insufficient to establish a violent collision. A comparison of the facts of that case with those of this action is sufficient to show that plaintiff here is not precluded from recovery by the principles of law announced therein. As a matter of fact, even were we to assume similarity in facts, later U. S. Supreme Court cases have weakened, if not destroyed the holding in the *Chamberlain* case.

In this action York testified he heard the collision, looked and saw the lantern of Conine falling. On cross-examination he testified there was nothing unusual about the coupling, but that as to the noise from the impact it was possible the noise from the train may have affected his ability to hear. After the three cars had been kicked down hold track No. 2, the engine proceeded over toward hold tracks Nos. 4, 5, and 6, which were the tracks being worked by York. This movement contemplated shoving some of the cars that were fouling a lead into those tracks. York was over near those tracks and was then paying attention to his work. Again, his actions speak louder than words. In spite of the noise that would be made by a switch engine, and that York's

attention was focused on his work, the noise of the coupling was sufficient to attract his attention, and cause him to turn to see the reason. It hardly seems probably an ordinary coupling would bring this about. Other matters which have a direct bearing on this element of the case are these: The grade of the track was up to the south and down to the north. Cars that were not blocked or on which the brake had not been set would roll to the north. The hand brake on the N. Y. C. car was not set and the physical evidence quite positively indicates this car was not coupled to the other three. York's statement of hearing the impact and seeing Conine fall, coupled with the location of the lantern, cap, and drag marks, place the point of impact north of the place where the cars came to a stop. If the jury found the point of impact as indicated, it would mean that the coupling was with sufficient force to move the N. Y. C. car either from a stop or by a change in direction a distance of from 80 to 120 feet, the distance depending on which car the jury found Conine to be riding. Consideration must also be given to the fact that the movement of this car was up grade. If these facts are considered collectively, together with the reasonable inferences deducible therefrom, it was reasonable for the jury to find the coupling was unusual and of sufficient force to throw Conine from the car.

Having decided the conclusion reached by the jury is a reasonable one, the ruling announced in the *Tennant case,* supra, is controlling. The prevailing opinion quotes the following:

"It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. *Washington & Georgetown R. Co.* v. *McDade,* 135 U. S. 554, 571, 572, 10 S. Ct. 1044, 1049, 34 L. Ed. 235;

*Tiller* v *Atlantic Coast Line R. Co.*, supra, 318 U. S. [54], 68, 63 S. Ct. [444], 451, [87 L. Ed. 610], 143 A. L. R. 967; *Bailey* v. *Central Vermont Ry.*, 319 U. S. 350, 353, 354, 63 S. Ct. 1062, 1064, 87 L. Ed. 1444. That conclusion, whether it relates to negligence, causation, or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."

In this particular action the appellant has advanced no theory favorable to itself which it claims is more reasonable. Its theory on the trial and in this court is that the undisputed facts are inconsistent with the inferences intended to be drawn. If the inferences were unreasonable or were unsupported by probative facts, then the court would reverse the judgment; otherwise, it must be sustained. For as said by the Supreme Court in the *Lavender case*, supra, 327 U. S. 645, 66 S. Ct. 743, 90 L. Ed. page 916:

"It is true that there is evidence tending to show that it was physically and mathematically impossible for the hook to strike Haney. And there are facts from which it might reasonably be inferred that Haney was murdered. But such evidence has become irrelevant upon appeal, there being a reasonable basis in the record for inferring that the hook struck Haney. The jury having made that inference, the respondents were not free to relitigate the factual dispute in a reviewing court. Under these circumstances it would be an undue invasion of the jury's historic function for an appellate court to weigh the conflicting evidence, judge the credibility of witnesses and arrive at a conclusion opposite from the one reached by the jury. See *Tiller* v. *Atlantic Coast Line R. Co.*, 318 U. S. 54, 67, 68, 63 S. Ct. 444, 451, 87 L. Ed. 610 [617, 618], 143 A. L. R. 967; *Bailey* v. *Central Vermont Ry Co.*, 319 U. S. 350, 353, 354, 63 S. Ct. 1062, 1064, 87 L. Ed. 1444 [1447, 1448]; *Tennant* v. *Peoria & P. U. R. Co.*, 321 U. S. 29, 35, 64 S. Ct. 409, 412, 88 L. Ed. 520, [525, 15 N. C. C. A., N. S., 647]. See also Moore, 'Recent Trends in Judicial Interpretation in Railroad Cases under the Federal Employers' Liability Act.' 29 Marquette L. Rev. 73."

Here the jury concluded the appellant was negligent as alleged in the complaint, and that its negligence contributed to the death of the deceased. The jury was free to disregard or disbelieve whatever facts were inconsistent with this

conclusion as long as there was an evidentiary basis for its verdict. Having found there is a reasonable basis in the record for the jury's conclusion that there was negligence on the part of the appellant which caused the death of Conine, it is irrelevant that this court might have come to a different conclusion. It is sufficient to say that selecting from among conflicting inferences and conclusions that which it considers the most reasonable is a function belonging to the jury.

WOLFE, J., concurs in the opinion of Mr. Justice PRATT and also in the views expressed by Mr. Justice LATIMER.